273 N.J. Super. 84 (1993)
640 A.2d 1216
MAXIM SEWERAGE CORPORATION, A NEW JERSEY PUBLIC UTILITIES CORPORATION, PLAINTIFF,
v.
THE MONMOUTH RIDINGS, AND LEONARD COHEN, INDIVIDUALLY AND T/A THE MONMOUTH RIDINGS, DEFENDANTS. THE MONMOUTH RIDINGS, THIRD-PARTY PLAINTIFF,
v.
WOODSTONE BUILDERS, INC., A NEW JERSEY CORPORATION, VIKING ENTERPRISES, A NEW JERSEY PARTNERSHIP, PHILIP SOLONDZ, DANIEL SOLONDZ, MICHAEL SOLONDZ, AND LEONARD SOLONDZ, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Law Division Union County.
Decided October 18, 1993.
*87 Robert Fettweis and Richard S. Schkolnick for defendants The Monmouth Ridings and Leonard Cohen and third-party plaintiff, The Monmouth Ridings.
Michael M. Rosenbaum and Claudia Costa for plaintiff Maxim Sewerage Corp.
Ira Gottlieb for third-party defendants Woodstone Builders, Inc., Michael Solondz and Leonard Solondz.
Thomas Durkin, Jr. for third-party defendants Viking Enterprises, Philip Solondz and Daniel Solondz.
WECKER, J.S.C.
Defendants The Monmouth Ridings and Leonard Cohen (collectively "The Ridings") move for leave to amend a counterclaim against plaintiff Maxim Sewerage Corporation ("Maxim") and to *88 similarly amend a third-party complaint against Woodstone Builders, Inc. ("Woodstone"), Viking Enterprises ("Viking"), Philip Solondz, Daniel Solondz and Leonard Solondz (but not Michael Solondz). The Ridings is a real estate developer with property in Howell Township which it seeks to subdivide for residential homes. Maxim is a local sewerage company, a public utility, with a franchise to serve the area of Howell Township where The Ridings' property is located. Viking and Woodstone are also real estate developers in the same area. Woodstone has already developed a 630-home subdivision and Viking plans to develop an adjacent area. The principals of Viking are Daniel and Philip Solondz, who are brothers. They are also the principals of Maxim. The principals of Woodstone are Leonard and Michael Solondz, the sons of Philip and Daniel, respectively.
Maxim's original complaint against The Ridings sought to enforce the terms of a 1989 Sewer Service Agreement, which was also the subject of proceedings before the Board of Public Utilities ("BPU"). Settlement of the BPU matter included a new sewer service agreement. The relief sought in this court included the right to retain funds deposited by The Ridings, and a declaration that this court has jurisdiction over all but the limited issues that were before the BPU. The Ridings' original counterclaim and third-party complaint alleged economic torts, breaches of contract and statutory duties, and sought damages, all arising out of the negotiation and execution of the 1989 Sewer Service Agreement.
The proposed amendments each add four counts, which are virtually identical. The new counts are entitled as follows:

Conspiracy to Violate Federal Counterclaim Count 5
 RICO: 18 U.S.C.A. § 1962(d) Third-party complaint
 Count 3
RICO: Violation of 18 U.S.C.A. Counterclaim Count 6
§ 1962(c) Third-party complaint
 Count 4
State RICO: Violation of Counterclaim Count 7
N.J.S.A. 2C:41-1 Third-party complaint
 Count 5
*89 Common Law Fraud Counterclaim Count 8
 Third-party complaint
 Count 6

The newly framed counts incorporate by reference the factual allegations of the original counts, which are entitled as follows:

Conspiracy to Tortiously Counterclaim Count 1/Third-party
Interfere with Prospective complaint Count 1
Economic Advantage
Tortious Interference with Counterclaim Count 2/Third-party
Economic and Contractual complaint Count 1
Relations
Breach of Contract Counterclaim only: Count 3
Breach of Duty by Public Counterclaim only: Count 4
Utility

Maxim argues that the settlement of the BPU matter bars The Ridings from asserting its proposed fraud and RICO claims. Maxim invokes the doctrine of election of remedies. The Ridings points to express language in the oral and written settlement agreements that preserve the Superior Court action. The doctrine of election of remedies is not applicable where all parties were aware of the two concurrent proceedings, and where damages were not available in the BPU action. There is no more reason to bar The Ridings' proposed claims than there would have been to dismiss either party's original claims.
During the pendency of this motion the Appellate Division decided State v. Ball and Big Apple Leasing Co., et als., 268 N.J. Super. 72, 632 A.2d 1222 (App.Div. 1993). Affirming state RICO convictions of defendants involved in illegal solid waste dumping and bribery of public officials, the Appellate Division unequivocally announced a much broader interpretation and application of state RICO than of its federal counterpart:
In summary, we adopt a broad approach in defining and applying New Jersey RICO. We hold that the application of New Jersey's statute is not limited to legitimate enterprises. The "enterprise" element will be satisfied if there exists a *90 group of people, no matter how loosely associated, whose existence or association provides or implements the common purpose of committing two or more predicate acts. We go so far as to hold the "enterprise" element is satisfied if the "enterprise" is no more than the sum of the racketeering acts. Thus, the "enterprise" does not have to be an organization whose purpose is greater than the predicate acts, nor does it have to evidence any definable structure. In a conspiracy setting, it is not necessary that a defendant agree to personally commit predicate acts. He or she need only agree that other members of the conspiracy will commit such acts. Nor is it necessary that a conspirator have knowledge of all aspects of the conspiracy or knowledge of all its participants. We also hold that the "pattern of racketeering activity" as defined in N.J.S.A. 2C:41-1d(1) and (2) is not unconstitutionally vague. Further, in order to establish a "pattern", it need only be shown the predicate acts are related. It is not necessary to show continuity as required under Federal RICO.

[At 144, 632 A.2d at 1259.]
Several arguments raised by Maxim in opposition to the proposed amendments are valid as to federal RICO, but do not preclude a state RICO claim in light of Ball. This result is consistent with the statutory mandate for liberal construction of New Jersey RICO. See N.J.S.A. 2C:41-6.
For reasons that are detailed below, The Ridings is denied leave to file the amended pleadings as proposed, insofar as they purport to state a federal RICO claim. The allegations of common law fraud and violations of state RICO will be permitted upon submission of an appropriate pleading, along with a proposed form of order, on notice to all counsel.

I. INTRODUCTION
When there is opposition to the filing of an amended pleading setting forth a new cause of action, the court must apply the same standard as it does on a motion to dismiss for failure to state a claim. E.g., Banks v. Wolk, 918 F.2d 418 (3d Cir.1990). This requires treating all the allegations of the pleading as true, and considering only whether those allegations are legally sufficient to establish the necessary elements of the claimed cause of action. Id.; Printing Mart-Morristown v. Sharp Electronics, 116 N.J. 739, 746, 563 A.2d 31 (1989). There is little doubt that The Ridings' allegations of common law fraud and state RICO violations are sufficient to state such claims.
*91 Maxim argues that the proposed pleadings must be pled with particularity and strictly construed, and so construed they are inadequate. It is true that the heavy penalties provided by RICO, along with its potential for encouraging "strike suits," require careful scrutiny of the pleadings. However, the court will not decline to infer cross-references between counts, where the requisite factual allegations appear elsewhere in the pleading. The proposed pleadings sufficiently allege the elements of New Jersey RICO.
Prior to Ball there had been little judicial interpretation of the state RICO statute, N.J.S.A. 2C:41-1 to -6.2. Except where inconsistent with Ball, New Jersey will still look to federal decisions interpreting RICO, 18 U.S.C.A. § 1961 to § 1968, to interpret the state offense. See State v. Ball, supra, 268 N.J. Super. at 103, 632 A.2d at 1238. See also State v. Passante, 225 N.J. Super. 439, 542 A.2d 952 (Law Div. 1987).
The Ridings' proposed pleadings complain of improper dealing by Maxim, the local sewerage authority, its principals Daniel, Philip and Leonard Solondz and their wholly owned entities, Viking and Woodstone (collectively "the Solondz family enterprise") with the purpose of delaying or denying sewer service or making service more costly to The Ridings. The alleged motive is to benefit defendants Woodstone and Viking, competing developers owned by principals of the sewerage authority or their family. The means allegedly used to impede or eliminate competition all arise out of the negotiation of the 1989 sewer service agreement, beginning in 1987, and include (1) false claims that Maxim's sewer capacity had been previously committed; (2) Maxim, Philip Solondz and Daniel Solondz creating evidence of such a commitment by backdating another agreement; (3) Maxim requiring The Ridings to calculate its sewerage capacity needs by a tougher formula than the other developers used;[1] and (4) Maxim attempting to *92 extort improvements to another Viking development based on the allegedly false claims referred to; all with knowledge that The Ridings could not proceed without sewer connection, and conditioning Maxim's approval of The Ridings' DEP application upon such improvements.
Here we have one victim, The Ridings, and essentially one alleged transaction or "scheme." That scheme is to hinder or deprive The Ridings of sewer service on terms comparable to its competitors, who have a special relationship with Maxim. The dual motive alleged is to eliminate competition in real estate development and/or to exact higher fees (directly or indirectly) for the water company. Maxim argues that if there were demands for a quid pro quo from the Ridings in the form of improvements or payments to neighboring developers, that is an ordinary commercial negotiation. This case is distinguished, however, by Maxim's status as a public utility and its alleged misuse of its public franchise to benefit private parties.

II. THE LAW
Federal RICO is clearly not limited to "traditional" notions of organized criminal activity. H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 243-49, 109 S.Ct. 2893, 2902-06, 106 L.Ed.2d 195, 210-13 (1989); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 at 495, 497-500, 105 S.Ct. 3275, 3284, 3285-87, 87 L.Ed.2d 346, 358-61 (1985). Neither is it intended to reach ordinary "garden-variety" fraud. E.g., Marshall-Silver Construction Co., Inc. v. Mendel, 894 F.2d 593, 597 (3d Cir.1990); Barticheck v. Fidelity Union Bank/First National State, 832 F.2d 36, 40 (3d Cir.1987). Multiple schemes are not required to state a RICO claim. H.J. Inc. v. Northwestern Bell Telephone Co., supra, 492 U.S. at 234 n. 2, 109 S.Ct. at 2898 n. 2, 106 L.Ed.2d at 205 n. 2. Both federal and state RICO impose a heavy sanction *93 (triple damages) where a "pattern" of criminal activity is found. It is reasonable then that a pattern should involve more than isolated criminal behavior. The question is, how much more?
In holding that New Jersey RICO is "even broader in scope than its federal counterpart," the Appellate Division cites the declaration of policy set forth at N.J.S.A. 2C:41-1.1c: "to prevent, disrupt, and eliminate the infiltration of organized crime type activities which are substantial in nature into the legitimate trade or commerce of this State."
State v. Ball, supra, 268 N.J. Super. at 104, 632 A.2d at 1239. The court contrasts "organized crime type activities" (emphasis added) with the narrower federal target: "eradication of organized crime" Ibid.
The acts alleged do not suggest the kind of continuing criminal activity, or threat of same, that federal RICO targets. However, there is no such requirement for a pattern under New Jersey RICO. Ibid. Additionally, although the failure to allege an enterprise separate from the defendants is fatal to the federal RICO claim, it is not a requirement under state RICO. Ibid.
The New Jersey RICO count alleges a substantive violation of N.J.S.A. 2C:41-2(c) as well as a conspiracy under N.J.S.A. 2C:41-2(d).
In order to prove a conspiracy to violate RICO under N.J.S.A. 2C:41-2d, the State must present evidence that defendant agreed to participate directly or indirectly in the conduct of the affairs of the enterprise by agreeing to commit, or to aid other members of the conspiracy to commit, at least two racketeering acts (N.J.S.A. 2C:41-1a.(1) and (2); N.J.S.A. 2C:41-1d.(1)); and that he or she acted knowingly and purposely with knowledge of the unlawful objective of the conspiracy and with the intent to further its unlawful objective. Cf. United States v. Riccobene, 709 F.2d 214, 224-25 (3d Cir.), cert. denied sub nom., Ciancaglini v. United States, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983) (construing parallel provision of Federal RICO). See also N.J.S.A. 2C:4-2 (New Jersey conspiracy law).

[Id., 268 N.J. Super. at 99, 100, 632 A.2d at 1236.]
The proposed federal RICO counts allege violations of 18 U.S.C.A. § 1962(c) and (d). The required elements of a substantive *94 RICO claim under § 1962(c) are virtually the same as the state RICO elements on first blush:
1. one or more persons (the defendants);
2. employed by or associated with the enterprise;
3. an enterprise engaged in or affecting interstate or foreign commerce[2];
4. defendants participating in the conduct of such enterprise's affairs;
5. participation through a pattern of racketeering activity;
6. evidenced by at least two related predicate acts.
E.g., Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1165 (3d Cir.1989). However, the elements of an "enterprise" and the "pattern of racketeering activity" are now much more easily established under state RICO than federal.
The issues raised by Maxim's opposition to this motion are:
A. If the same "persons" who are named defendants together make up the enterprise, does that identity of the "persons" and the "enterprise" defeat the cause of action?
B. Is the alleged "racketeering activity" sufficiently related and sufficiently continuous to establish the required "pattern" of racketeering activity?
As a practical matter, any remedy available under federal RICO is available under state RICO. Nevertheless, analysis of both claims is appropriate.

A. Identity of persons and enterprise

There is a rule in the Third Circuit that the "enterprise" named in a § 1962(c) count cannot be a defendant on that count. The rule stems from the policy underlying § 1962(c): "to govern only those instances in which an `innocent' or `passive' corporation is victimized by the RICO `persons,' and either drained of its own money or used as a passive tool to extract money from third parties."
Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1359 (3d Cir.1987), citing B.F. Hirsch v. Enright Refining Co., Inc., 751 F.2d 628, 633-34 (3d Cir.1984), and Haroco, Inc. v. *95 American Nat'l Bank and Trust Co., 747 F.2d 384, 399-402 (7th Cir.1984). The rationale behind what is known as the Enright rule is that to allow the very "persons" who constitute the "enterprise"[3] to remain as defendants would make the victimized enterprise liable to other victims of the actual perpetrators. See Petro-Tech, supra, 824 F.2d at 1359. Where the enterprise and the defendants are the same persons, there is a failure to state a claim under 18 U.S.C.A. § 1962(c).
In 1991, the Third Circuit reaffirmed the Enright rule: the enterprise and the defendants must be sufficiently distinct in a § 1962(c) action. See Glessner v. Kenny, 952 F.2d 702, 711-12 (3d Cir.1991); Brittingham v. Mobil Corp., 943 F.2d 297, 300-03 (3d Cir.1991).[4] Here, The Ridings named as defendants three entities (Maxim, Woodstone and Viking) and four individuals (Leonard, Daniel, Philip and Michael Solondz) who are owners, principals or partners in one or more of the defendant entities. The association-in-fact enterprise is alleged to be a combination of the same three entities and three of the four individuals. The substantive allegations describe the use of the entities Maxim, Woodstone and Viking in a scheme to delay or deny sewer connections essential to The Ridings' land development. The identity of alleged perpetrators and entities precludes the inference that any "enterprise" has been victimized or misused. The necessary distinctiveness is clearly missing and the 18 U.S.C.A. § 1962(c) count fails the Enright test.
New Jersey RICO, N.J.S.A. 2C:41-1 to -6.2, defines "person" more broadly than the federal statute. Compare N.J.S.A. 2C:41-1b ("`person' includes any individual or entity or enterprise as defined herein" (emphasis added)) with 18 U.S.C.A. § 1961(3) *96 ("`person' includes any individual or entity"). The Appellate Division in Ball makes it clear that the broader definition of "person" under New Jersey RICO eliminates the Enright distinctiveness rule for an action under N.J.S.A. 2C:41-2c, the comparable state statute to 18 U.S.C.A. § 1962(c).

B. Pattern of Racketeering Activity

Both statutes require certain "predicate acts" to establish a pattern. Under 18 U.S.C.A. § 1961(5), a "`pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within 10 years ... after the commission of a prior act of racketeering activity."
Case law rather than the federal statute further defines and refines the requirements. The New Jersey statute is more explicit. N.J.S.A. 2C:41-1d. provides:
"Pattern of racketeering activity" requires
(1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act [June 5, 1981] and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity; and
(2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.
Defendants' proposed pleadings allege mail fraud and extortion as predicate acts of racketeering under federal law and extortion and forgery as the state acts of racketeering.
In H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the United States Supreme Court set forth two requirements  relatedness of the predicate criminal acts and continuity of criminal activity  to establish a "pattern of racketeering activity" under federal RICO. 492 U.S. at 239, 109 S.Ct. at 2900, 106 L.Ed.2d at 208: "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the *97 racketeering predicates are related, and that they amount to or pose a threat of continuing criminal activity."
That case arose out of the claim by Bell customers that the company and its officers had routinely engaged in bribery of members of the Minnesota Public Utilities Commission over a period of six years, thereby increasing Bell's rates to its customers. Case by case analysis of future cases was suggested by the Court, and federal litigation on this issue has proliferated.
Setting out to define the "pattern" requirement of the statute, the Court in H.J. first rejected the argument that more than one illegal scheme is required, and similarly rejected the sufficiency of two predicate acts of racketeering, without more. 492 U.S. at 237-38, 109 S.Ct. at 2899-2900, 106 L.Ed.2d at 206-07. Referring to "relatedness" and "continuity" as necessary elements of a pattern of racketeering activity, the Court held: "For analytic purposes these two constituents of RICO's pattern requirement must be stated separately, though in practice their proof will often overlap."
Id. at 239, 109 S.Ct. at 2901, 106 L.Ed.2d at 208.

1. Relatedness as an essential element of the pattern.

The Supreme Court in H.J. relies on Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d 346, 358, to conclude that the relatedness element can be found from acts with the same or similar "purposes, results, participants, victims, or methods of commission, or otherwise ... interrelated by distinguishing characteristics and ... not isolated events." The Court found guidance for its interpretation of RICO, which is Title IX of the Organized Crime Control Act, in Title X of the same enactment, known as the Dangerous Special Offender Sentencing Act. Id. Almost the identical language is contained in New Jersey's statutory definition of relatedness, N.J.S.A. 2C:41-1d(2) (quoted above).
There is no real question that the relatedness requirement is met by the allegations of the proposed pleadings taken as a whole. *98 That finding, however does not alone establish the necessary pattern for federal RICO.

2. Continuity as an Essential Element of the Pattern.

The Appellate Division has now clearly held that "continuity," which is a requirement under federal RICO, is not a defining element of a "pattern of racketeering activity" for state RICO.
The court cites the explicit definition of a "pattern" in New Jersey RICO, missing from the federal statute, to eliminate the federal common law requirement of "continuity." State v. Ball, supra, 268 N.J. Super. at 138-44, 632 A.2d at 1257-59.
Following the reasoning of the Oregon Supreme Court, we are persuaded that New Jersey's statute does not require a showing of continuity.... New Jersey RICO's more complete "pattern" definition can stand alone. Therefore resort to federal case law for guidance as to its meaning is not necessary. Moreover, since the New Jersey statute explicitly requires only a showing of relatedness among predicate acts, there is no reason why the additional element of continuity, which is associated with Federal RICO, should be grafted onto New Jersey's statutory definition. The "Declaration of Policy and Legislative Findings" contained in N.J.S.A. 2C:41-1.1 does not include "long term" criminal activity, indicating that the New Jersey legislature was concerned with the elimination of organized crime in all its forms, regardless of its duration.

[Id., 268 N.J. Super. at 142, 632 A.2d at 1258-59.]
Federal RICO, however, is more restrictive:
"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. See Barticheck v. Fidelity Union Bank/First National State, 832 F.2d 36, 39 (CA3 1987). It is, in either case, centrally a temporal concept  and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated. See S.Rep. No. 91-617, at 158.
Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case.
....

*99 The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists. The development of these concepts must await future cases, absent a decision by Congress to revisit RICO to provide clearer guidance as to the Act's intended scope.
[H.J., Inc. v. Northwestern Bell Telephone, Co., 492 U.S. at 242-43, 109 S.Ct. at 2902-03, 106 L.Ed.2d at 209-10.]
The Court in H.J. cites with approval the two alternate concepts of continuity described by the third circuit in Barticheck v. Fidelity Union Bank/First National State, 832 F.2d 36, 39 (3d Cir.1987): a closed period of repeated conduct or an open-ended period with the threat of future repetition. In Barticheck the court reinstated a complaint that alleged a "pattern" based upon more than two acts of mail fraud in furtherance of a single "scheme" to fraudulently obtain loan applications from investors. The court analyzed the RICO claims in terms of the pattern requirements of the statute (not under the non-statutory concept of a "scheme") and declined to rule out completed (closed-end) activity as a basis for a RICO action. Id. at 38-39. A single, completed scheme does not automatically escape prosecution under RICO. Id.
A fact-sensitive analysis must consider "a combination of specific factors such as the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity."
Barticheck v. Fidelity Union Bank/First National State, supra, 832 F.2d at 39, citing Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1355 (3d Cir.1987). The bottom-line question is stated by the Third Circuit in Hindes v. Castle, 937 F.2d 868, 875 (3d Cir.1991) (gubernatorial campaign funds diverted to Lieutenant Governor's campaign): "It remains an open question whether RICO liability is ever appropriate for a [sic] single-scheme, single-victim conduct threatening no future harm."
*100 The key is either past activity of sufficient duration or the threat of continuing future criminal activity. Id. at 876, citing H.J. The third circuit in Swistock v. Jones, 884 F.2d 755, 757 (3d Cir.1989) said "[e]ven a closed-ended scheme of short duration, however, could involve a `distinct threat of long-term racketeering activity, either implicit or explicit.'"
The implicit threat exists if the predicate acts are "`part of an ongoing entity's regular way of doing business.'" Id. The Swistock court, denying the motion to dismiss RICO claims, noted that allegations regarding "other potential transactions with plaintiffs ... are not inconsistent with proof that defendants regularly conducted their business via predicate acts of racketeering." Id. at 759[5]. The court opined that neither the number of victims, the number of perpetrators nor the number of schemes was determinative. This "single scheme  single victim" case was held to state a cause of action sufficient at least to allow discovery to proceed. Id. at 875.
Maxim cites several recent federal district courts that dismissed RICO claims upon finding a single victim, a single scheme and no continuing threat of criminal activity. Constitution Bank v. DiMarco, 815 F. Supp. 154 (E.D.Pa. 1993); Harris Trust and Savings Bank v. Salomon Bros., 813 F. Supp. 1340 (N.D.Ill. 1992). The Ridings' proposed federal RICO cause of action is defeated not by the fact of a single victim or a single scheme. Rather it is the absence of any allegation of a continuing or continued threat of racketeering activity that requires denial of the amended pleadings under federal RICO. There is no allegation that whatever Maxim or the Solondz parties did to the Ridings was, is or will be a "regular way of doing business" for Maxim. See Hughes v. Consol-Penn. Coal Co., 945 F.2d 594, 609-11 (3d Cir.1991).

*101 C. Conspiracy

The Riding's proposed amended pleadings also charge defendants under 18 U.S.C.A. § 1962(d) with conspiracy to violate the federal racketeering statute, § 1962(c).
To plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose.... Additional elements include agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity. [citations omitted]
[Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1166-67 (3d Cir.1989).]
A conspiracy can be proved by overt acts that do not themselves constitute predicate acts of racketeering activity sufficient to satisfy § 1962(c). Id. at 1169. Thus a finding that The Ridings' pleadings fail to state a claim under § 1962(c) because they are insufficient to establish a pattern of racketeering does not necessarily mean that no claim for conspiracy is stated. Id. However, where the § 1962(c) claim fails for lack of distinction between the enterprise and the defendant persons, the federal conspiracy claim must fail as well, since the object of the conspiracy is not sufficiently alleged under § 1962(c).
For state RICO, the defendant needs only to agree that he or other members of the conspiracy will commit two racketeering acts, with knowledge of the unlawful objective and the intention to further that objective. See State v. Ball, supra, 268 N.J. Super. at 133-34, 632 A.2d at 1254. The state RICO counts, incorporating by reference the allegations of the federal RICO counts, sufficiently set forth the required elements of a conspiracy under state RICO.
NOTES
[1] The Ridings claims that Maxim fraudulently misrepresented that a 400 gallon per day ("gpd") per unit formula was "always" used, when in fact certain developments were allowed to use 300 or 350 gpd. Maxim says there was no fraud, that state regulations, N.J.A.C. 7:9-1.50, govern the formula.
[2] The test of interstate commerce is minimal. Use of the U.S. Postal Service is enough. E.g., Cadle Co. v. Schultz, 779 F. Supp. 392 (N.D.Tex. 1991). For state RICO, 2C:41-1 to -6.2, substitute commerce within New Jersey.
[3] This includes an "association-in-fact" under 18 U.S.C.A. § 1961(4).
[4] In Rose v. Bartle, 871 F.2d 331, 359 (3d Cir.1989), the court allowed the entity named as an enterprise under § 1962(c), which was also victimized by certain co-defendants' racketeering activity, to remain as a defendant on claims asserted by a different victim.
[5] The allegations included fraudulent misrepresentations by lessors of coal mining property regarding the quality and quantity of coal reserves; lack of knowledge of violations of environmental regulations; double billing for equipment sold separately; and misrepresentations in negotiating a settlement agreement.