696 A.2d 744

INTERCHANGE STATE BANK, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. JOSEPH RINALDI AND RAE RINALDI, DEFENDANTS, AND VINCENT RINALDI AND ARLINE RINALDI, DEFENDANTS–APPELLANTS/CROSS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 6, 1997—Decided July 14, 1997.

240

Before Judges D'ANNUNZIO, NEWMAN, and VILLANUEVA.[1]

*Brian D. Spector* argued the cause for appellants-cross respondents (*Spector & Ehrenworth*, attorneys; *Mr. Spector*, of counsel; *Michele Coleman*, on the brief).

*Mitchell B. Seidman* argued the cause for respondent-cross-appellant (*Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen*, attorneys; *Mr. Seidman*, of counsel and on the brief).

The opinion of the court was delivered by

VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).

Defendants, Vincent and Arline Rinaldi ("defendants"), appeal from an order granting summary judgment against them based on their guarantees. Plaintiff, Interchange State Bank, cross-appeals from the portion of the judgment which limited its attorney's fees

---

[1] Judge Newman did not participate in oral argument. However, the parties consented to his participation in the decision.

to $70,000 and awarded post-judgment interest at the legal rate, rather than the contract rate.

This case arises out of a bank-borrower relationship pursuant to which plaintiff extended various financings to the borrower, North East Electric Company, Inc. ("NEEC"), an entity engaged in the business of providing electrical contracting services to the construction industry. Repayment of NEEC's obligations to plaintiff was personally guaranteed by NEEC's owners, Joseph Rinaldi and Vincent Rinaldi, as well as their wives, Rae Rinaldi and Arline Rinaldi.

The debtor-creditor relationship between the parties began on or about May 6, 1991, when plaintiff simultaneously extended NEEC a $500,000 Line of Credit and a $500,000 Term Loan. The credit was secured by a lien on the business assets of NEEC, as well as junior liens on the personal residences of Joseph Rinaldi and his wife Rae, as well as Vincent Rinaldi and his wife Arline. Vincent Rinaldi was the President of NEEC, and Joseph Rinaldi was the company's Vice President.

Although NEEC was able to make payments on both loans, the plaintiff became concerned with the credit relationship because NEEC was "unable to reduce or clean-up" the Line of Credit. In 1992 NEEC began to experience a decline in revenues and profitability, and this, coupled with the non-collection of two large receivables, placed a strain on the company's financial condition. In response to plaintiff's concerns, Vincent Rinaldi forwarded a letter to the plaintiff on May 18, 1993, acknowledging the plaintiff's request for payment on the Line of Credit within ninety days, and requesting the renewal of the line for an additional twelve months. Defendants sought to placate plaintiff's concerns by relating various plans for infusion of capital. However, the plaintiff never received definitive information, copies of a contract or formal agreement.

In July 1993, an Assistant Treasurer with plaintiff summarized NEEC's condition, and made a credit recommendation to the bank's Internal Loan Committee as follows:

> There is a lack of a solid financial plan which would warrant the renewal of the company's Line of Credit and therefore it is recommended that the Line of Credit be converted to a term loan and combined with the company's existing term loan to be paid out over five years.

On November 9, 1993, plaintiff consolidated all of the NEEC's debt with a Term Loan Agreement of $694,253, reflecting the aggregate outstanding amount due on the initial Term Loan and Line of Credit. Defendants Joseph Rinaldi, Rae Rinaldi, Vincent Rinaldi and Arline Rinaldi each personally guaranteed the repayment of this consolidated debt. As security for the indebtedness defendants agreed to furnish, among other documents, the following: personal guarantees for repayment; a first mortgage on two parcels of land in New York; a second mortgage on the residence of Vincent and Arline Rinaldi; and a third mortgage on the residence of Joseph and Rae Rinaldi.

On June 23, 1994, plaintiff filed a complaint based upon all defendants' guarantees. Plaintiff asserted that NEEC had defaulted under the Term Loan Agreement and Promissory Note by reason of, among other actions, the liquidation of its assets, failure to make payments of principal and interest when due, and having filed for relief under Chapter 11 of the Bankruptcy Code.

NEEC had indeed filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on or about April 22, 1994, which was subsequently converted to Chapter 7. Prior to filing for bankruptcy, NEEC had failed to pay federal taxes. Consequently, many of NEEC's receivables became subject to the government's first priority tax lien ahead of plaintiff. Plaintiff was able to obtain relief from the automatic stay to pursue collection of those remaining receivables. Plaintiff also reached an agreement with the Internal Revenue Service ("I.R.S."), permitting it to collect on NEEC receivables which were then subject to liens of both the I.R.S. and itself. The I.R.S. permitted plaintiff to deduct ten percent from the recovered amount to apply towards counsel fees, with the remaining balance to be divided according to a predetermined formula.

On or about October 7, 1994, plaintiff moved for summary judgment against defendants Vincent Rinaldi and Arline Rinaldi. The notice also indicated that plaintiff was dismissing the action, without prejudice, against Joseph Rinaldi because of his filing for personal bankruptcy on June 24, 1994.[2] On or about November 8, 1994, defendants Vincent Rinaldi and Arline Rinaldi moved for an order to dismiss the complaint, or in the alternative, for leave to amend their answer and assert a counterclaim as to plaintiff's alleged violation of the Bank Holding Company Act ("Act"), 12 U.S.C.A. §§ 1971 to 1978.

When the motions were heard on March 17, 1995, the court ruled that Vincent and Arline Rinaldi ("defendants") were liable on their guarantees, and directed the plaintiff to file a supplemental report regarding its actual damages. Defendants were given the opportunity to respond to the plaintiff's calculation. No form of order was entered after this hearing. Plaintiff submitted the requested certifications, and defendants filed their response to the certifications.

In an order dated June 27, 1995, a new judge granted partial summary judgment in favor of plaintiff as to liability and denied defendants' cross-motion, "based on the rulings made by" the first judge. The order also permitted additional discovery for the singular purpose of determining plaintiff's damages. The court specifically sought to ascertain the difference between the amount already recouped by plaintiff and the amount remaining due.

On June 17, 1996, another judge presided over a hearing regarding plaintiff's damages. The parties stipulated as to the amount of principal and interest due. The remaining disputed issue was plaintiff's legal fees incurred in the guaranty action. The court heard oral argument on the issue, and concluded the proceedings with a request for additional evidentiary submissions.

---

[2] Apparently Rae Rinaldi also filed for bankruptcy with her husband Joseph Rinaldi. Plaintiff has consummated its settlement with Joseph and Rae Rinaldi, and has collected the $85,000 settlement amount.

After plaintiff submitted a certification of services rendered, defendants responded. In addition, both parties then raised the issue of the rate of post-judgment interest.

In an order entered June 28, 1996, pursuant to a hearing of the same date, the trial court awarded the stipulated amounts of principal and interest of $442,864.07 and $18,268.15 respectively, and reduced the plaintiff's requested attorney's fees by approximately $34,000, to a total of $70,000 for both guaranty and liquidation actions. The court also held that post-judgment interest would accrue at the legal, versus contract, rate "until this Judgment is satisfied in full."

On or about July 10, 1996, defendants filed a motion for a stay pending appeal and a waiver of the supersedeas bond requirement, R. 2:9–5(a). Defendants were granted a stay pending appeal conditioned upon the posting of a $100,000 supersedeas bond by September 20, 1996. Said bond was obtained by defendants.

Defendants Vincent and Arline Rinaldi filed a timely notice of appeal of the June 28, 1996 order entered in favor of plaintiff in the amount of $531,132.22. Plaintiff filed a cross-appeal as to the portion of the judgment limiting counsel fees and designating the legal, as opposed to contract, rate for accrual of post-judgment interest.

We note that defendants have appealed the wrong order. Defendants' Notice of Appeal states that defendants are taking an appeal "from the judgment entered in this action on June 28, 1996 in favor of plaintiff in the amount of $531,132.22." However, they fail to reference the June 27, 1995 order awarding plaintiff partial summary judgment on liability, despite the fact that defendants contend on their appeal that they have no liability to the plaintiff.

## I.

On appeal, defendants argue that the trial court erred in granting summary judgment because it misinterpreted the guar-

anty and concluded that there were no genuine issues of material fact. Defendants argue that plaintiff impaired the collateral, plaintiff's liquidation of the collateral was not commercially reasonable and plaintiff did not liquidate the collateral in good faith. In addition, defendants argue that there was a genuine issue of fact regarding plaintiff's calculation of damages. Lastly, defendants argue that the trial court erred by refusing to permit them to amend their answer to assert a counterclaim under the Bank Holding Company Act.

## II.

Defendants assert that the language of the guaranty is not unconditional and, as such, did not bar them from raising various defenses to its enforcement.

This initial claim requires an analysis of the nature and purpose of the guaranty, and the understanding of defendants in providing that guaranty. The instant guaranty clearly gave broad rights to plaintiff. It states that the terms of the guaranty "will continue to be in effect until you have received from [guarantor] a written notice cancelling the guaranty. A notice of cancellation will not affect [guarantors'] liability for any Obligation that the Borrower already owes [Interchange] at that time." The guaranty also indicates that the bank "can demand payment from [guarantors] without first seeking payment from the Borrower or any other guarantor, or first trying to collect from any collateral."

Thus, the guaranty conveyed virtually unfettered discretion to the plaintiff in its efforts to collect payment and dispose of collateral. See Lenape State Bank v. Winslow Corp., 216 N.J.Super. 115, 127–28, 523 A.2d 223 (App.Div.1987)(holding that an unconditional guaranty grants the lender full power, in its uncontrolled discretion and without notice to debtor, to deal in any manner with debtor's liabilities and collateral).

Concededly, plaintiff's guaranty does not use the specific verbiage denoting defendants as "unconditional" guarantors. However, no such language appeared in the guaranty challenged in

*Langeveld v. L.R.Z.H. Corp.*, 74 *N.J.* 45, 376 *A.*2d 931 (1977), yet our Supreme Court deemed the guaranty to be "unconditional". *Id.* at 54, 376 *A.*2d 931. The wording of the instant guaranty equates to language purporting to make a person in the defendants' position an "unconditional guarantor." "Unconditional" language is "normally held to permit the creditor to move against the guarantor without first proceeding either against the principal debtor or the collateral." *Id.* The trial court was correct in its determination that the guaranty was unconditional.

## III.

Defendants argue that their asserted defenses to liability raised genuine issues of material fact which should have precluded summary judgment.

The defense of impairment is derived from the right of subrogation, a right which is entitled to protection in all but the most exceptional of circumstances. *Lenape, supra,* 216 *N.J.Super.* at 126, 523 *A.*2d 223. Impairment of collateral will extinguish the obligation of the guarantor, at least to the extent of the value of collateral impaired. *Langeveld, supra,* 74 *N.J.* at 50–51, 376 *A.*2d 931.

The guarantor's agreement to assume personal liability for any deficiency remaining after liquidation of the collateral necessarily suggests that the guarantor has a strong interest in the preservation of the collateral, as any reduction in the value of the collateral could potentially increase the guarantor's liability. Consequently, the Uniform Commercial Code provides:

Discharge of indorsers and accommodation parties

e. If the obligation of a party to pay an instrument is secured by an interest in collateral and a person entitled to enforce the instrument impairs the value of the interest in collateral, the obligation of an indorser ... is discharged to the extent of the impairment. The value of an interest in collateral is impaired to the extent the value of the interest is reduced to an amount less than the amount of the right of recourse of the party asserting discharge, or the reduction in value of the interest causes an increase in the amount by which the amount of the right of recourse

exceeds the value of the interest. The burden of proving impairment is on the party asserting discharge.

. . .

g. Under subsection e. . . ., impairing value of an interest in collateral includes . . . failure to comply with applicable law in disposing of collateral.

. . .

i. A party is not discharged under this section if the party asserting discharge consents to the event or conduct that is the basis of the discharge, or the instrument or a separate agreement of the party provides for waiver of discharge under this section either specifically or by general language indicating that parties waive defenses based on suretyship or impairment of collateral.

[*N.J.S.A.* 12A:3–605.]

■ Subsection (e) deals with discharge of sureties for impairment of collateral, and generally conforms to former Section 3–606(1)(b). The surety is subrogated to the payee's security interest in the collateral. The importance of suretyship defenses is greatly diminished, however, by the fact that the Code allows waiver under *N.J.S.A.* 12A:3–605(i). Thus, discharge under Section 3–605 applies only to cases wherein the creditor did not include a waiver clause in the instrument or the creditor failed to obtain the surety's permission to take action which triggers a suretyship defense.

■ Subsection (i) allows suretyship defenses to be waived, either specifically or by general language indicating that defenses based on suretyship and impairment of collateral are waived. No particular language or form of agreement is required; however, "absent express agreement, waiver or renunciation, a surety's right of subrogation to *unimpaired* collateral will be protected." *Langeveld, supra,* 74 *N.J.* at 54, 376 *A.*2d 931; *see also Delaware Truck Sales, Inc. v. Wilson,* 131 *N.J.* 20, 34, 618 *A.*2d 303 (1993) (waiver "must be unequivocal before it will effectively preclude a guarantor from asserting the defense." (citation omitted)).

For purposes of determining the validity of defendants' defense of impairment, we must analyze the instant guaranty and not only

assess whether it is "unconditional", but whether it contains the requisite waiver vis-a-vis the disposition of secured collateral. In *Langeveld, supra,* our Supreme Court did not deem the guaranty language at issue to equate to a waiver or relinquishment of the right of subrogation, and as such, the guaranty was merely deemed to be unconditional. *Id.* at 54, 376 *A.2d* 931. In fact, the language was rather brief, and limited to provisions dispensing with presentment, notice of dishonor and protest, and continuing liability on the part of the guarantor in the event of the obligor's insolvency. *Id.* at 52–53, 376 *A.2d* 931.

By contrast, the instant guaranty not only included the aforementioned provisions, but also those concerning plaintiff's right to pursue payment from defendants prior to proceeding against "the Borrower or any other guarantor," as well as the absolute right to disposition of collateral by release, exchange or sale. While the instant guaranty is more abbreviated in length than the guaranty in *Lenape, supra,* the scope of provisions is comparable. Accordingly, the language of the subject guaranty supports the trial court's conclusion that it contained an unequivocal waiver, making defendants absolute guarantors.

Notably, our Supreme Court in *Langeveld* determined that even in the case of an unconditional guaranty a creditor may not impair the collateral unless "the instrument of guaranty specifically frees the creditor from liability for such impairment." *Id.* at 53, 376 *A.2d* 931. The collateral provision in plaintiff's guaranty clearly qualifies as "unequivocal" measured by the *Langeveld* standard. Accordingly, defendants have no basis to claim discharge from their obligation pursuant to any alleged impairment of the collateral.

Defendants next claim that after default plaintiff disposed of the collateral in a commercially unreasonable manner, in violation of *N.J.S.A.* 12A:9–504(3). New Jersey treats "commercial unreasonableness" as a counterclaim or defense which the debtor must raise in order to shift the burden of proof to the creditor,

who then bears the burden of proving compliance. *See Franklin State Bank v. Parker*, 136 *N.J.Super.* 476, 346 *A.*2d 632 (1975).

Initially, defendants assert that they received no notice of the plaintiff's liquidation of NEEC's accounts receivable. Because defendants limit their argument to the disposition of accounts receivable, the governing statutes are *N.J.S.A.* 12A:9–501 and *N.J.S.A.* 12A:9–502; section 9–502 is applicable where the collateral consists of accounts receivable, chattel paper or instruments of indebtedness. Thus, defendants' argument concerning the notice provisions of *N.J.S.A.* 12A:9–504(3) is inapt.

The purpose of section 9–502(1) "is to provide an alternative method for a secured party to foreclose a security interest in accounts receivable.... [The] subdivision (1) allows a creditor to collect directly from the account debtor...." *Western Decor & Furnishings Industries, Inc. v. Bank of America N.T.S.A.*, 91 *Cal.App.*3d 293, 154 *Cal.Rptr.* 287 (1979) (interpreting California Commercial Code section 9–502(1) which contains language identical to that of *N.J.S.A.* 12A:9–502(1)).

In a case bearing considerable similarity to the instant matter, the debtor in *Western Decor* claimed that the bank failed to comply with the notice requirement prior to making direct contact with the account debtors. A California Court of Appeal held that section 9–502(1) does not impose a statutory obligation upon creditors to provide debtors notice before attempting to collect from the account debtors directly. *Western Decor, supra*, 91 *Cal.App.*3d at 303, 154 *Cal.Rptr.* 287.

In *Mfrs. & Traders Trust Co. v. Pro–Mation, Inc.*, 115 *A.D.*2d 976, 497 *N.Y.S.*2d 541 (1985), a New York Appellate Division court specifically rejected a debtor's claims of commercially unreasonable conduct on the part of the creditor, where the creditor sought payment of debtor's accounts receivable. The court interpreted *U.C.C.* 9–502(1), read in conjunction with an unconditional guaranty, as authorizing creditors' efforts to notify accounts receivable debtors directly and request remission of payment to the bank.

*Id.* 497 N.Y.S.2d at 542; *see also U.S. v. Delco Wire & Cable Co., Inc.,* 772 *F.Supp.* 1511, 1521 (E.D.Pa.1991)(holding that "a lender owning a security interest in accounts receivable may, upon default by the creditor, notify the account debtor to make payment directly to the secured party.").

■ Next, defendants assert that plaintiff failed to act in a commercially reasonable manner. Statutorily, *N.J.S.A.* 12A:9–502(2) provides that a secured party who undertakes to collect from account debtors must proceed in a commercially reasonable manner. Defendants specifically allege that: (1) plaintiff failed to provide requisite notice of its efforts to liquidate NEEC's accounts receivable; (2) plaintiff failed to procure the highest return on NEEC collateral; (3) plaintiff refused to accept assistance offered by defendant Vincent Rinaldi; and (4) plaintiff reached an inequitable release agreement with defendants Joseph Rinaldi and Rae Rinaldi.

In reviewing the evidence, however, the record demonstrates that plaintiff acted in a commercially reasonable manner. The allegations raised by defendants are either legally untenable (i.e. notice), or unsupported by the evidence. The record is replete with correspondence between plaintiff and NEEC debtors, as well as the parties themselves, demonstrating plaintiff's ongoing effort to collect the accounts receivable.

Lastly, as to defendants' defense concerning the allegedly favorable treatment of co-defendants Joseph Rinaldi and Rae Rinaldi, defendants' argument is similarly without merit. *R.* 2:11–3(e)(1)(E). The guaranty explicitly indicates that "[defendants'] liability under this guaranty will not be limited or canceled because … [the bank] release[s] any other guarantor of the Borrower's Obligations." Moreover, defendants, by signing the guaranty, expressed an understanding "that [defendants are] responsible for the payment of the full amount of the Obligations, even if there are other guarantors."

## IV.

Both parties appeal the court's award of counsel fees. The court received substantial evidence concerning plaintiff's efforts to collect on the guaranty as well as to liquidate the collateral. Plaintiff's counsel sought an award of $103,724.97, which included approximately $38,000 in connection with the liquidation efforts, and the balance reflecting the accrual of fees in association with the personal guaranty action. Plaintiff's counsel billed at rates of $195 for Mr. Seidman, and $190 for Mr. Sherwood. The court ultimately reduced the counsel fee to $70,000 for both the guaranty and liquidation work.

Defense counsel contests plaintiff's recovery of fees incurred for liquidation of the collateral as well as collection on the guarantee. In response to defendants' same argument at the damages hearing the court responded that, in its opinion, the Note did not specifically provide for recovery of fees associated with the collection efforts or costs associated with same on the guarantee itself. The trial court concluded that it was "convinced that the guarantors are liable to the fullest extent of the outstanding debt, plus what ever [sic] it cost the bank to collect the default on the guarantee." We concur with the court's determination that the guaranty cannot sensibly be read to limit recovery of counsel fees only to efforts expended on the personal guaranty.

Plaintiff's cross-appeal concerns, in part, the court's decision to reduce the counsel fees in its award by approximately 30%. A review of the record clearly indicates that the court deemed incredible the total amount of fees generated, for example, stating "I'm just curious about how you could have amassed such a fee in so short a time just on that phase on this action." Counsel responded that when plaintiff filed its motion for summary judgment it "regarded this (case) as a simple note case and a guarantee case." However, defendants' response was to raise virtually "every argument" in the area of lender liability (which they have continued to do on this appeal). As such, counsel asserted that

the fees generated reflected the time necessary to mount a rigorous response to defendants' numerous defenses.

Approximately $65,000 in fees were generated in relation to collection on the guarantee. Additionally, plaintiff incurred approximately $38,000 in legal fees connected with efforts to liquidate the assets of NEEC. Plaintiff's efforts were severely complicated due to the developments associated with both NEEC's and Joseph Rinaldi's bankruptcy cases. Plaintiff also had to contend with the I.R.S. due to the failure of NEEC to pay taxes before its collapse.

In making its determination, the court concluded that "a portion of the counsel fee request relates to matters which really were not pertinent to the debtor's obligation—namely, the work in connection with the bankruptcy of Joseph Rinaldi [sic], except insofar as it sought to remove the stay." The court focused on the "terms of the note which say that with respect to outside Counsel fees, it should be fair and reasonable."

Relating to the issue of the I.R.S. liens, the court commented that while it was "not deprecating the work done by Counsel for plaintiff in liquidating the collateral, ... these are not peculiar tasks." The court then allowed $30,000 in counsel fees with respect to the portion relating to fees generated in connection with liquidation of the collateral.

On the issue of the guaranty, the court remarked that despite the rather simplistic case history, with the exception of the protracted period of discovery before the motion for summary judgment was heard, plaintiff's counsel generated fees in excess of $65,000. "I will tell you I consider that [amount] to be awesome." While the court acknowledged that the numerous defenses to the action "admittedly ran up the bill," the court expressed doubt that it could have run to the "extent of the enormity of the bill submitted." The court then concluded that the fair and reasonable compensation for plaintiff's counsel would be to allow $40,000 with regard to the guaranty suit.

We are satisfied that it was an abuse of discretion to limit the award of plaintiff's counsel's fees to $70,000. Under the circumstances, the amount does not appear to be unreasonable. More importantly, the record lacks any real quantitative analysis concerning the propriety of the fees as relates to plaintiff's efforts to collect on the guaranty and liquidate the collateral. The quantity and quality of legal services rendered in this case could arguably be substantiated given the complexities associated with the collateral and the various defenses raised. The trial court never indicated what specific fees were being disallowed nor the basis for its decision. Based upon the record and plaintiff's counsel's certification, the counsel fees submitted appear to be warranted. Therefore, we remand for reconsideration.

### V.

Defendants next contend that the trial court erred by refusing to permit them to amend their answer to the original complaint and assert a counterclaim. Specifically, defendants assert that plaintiff violated the anti-tying provisions of the Bank Holding Company Act ("Act"), 12 *U.S.C.A.* §§ 1971 to 1978. The last judge denied defendants' motion in the June 27, 1995 order, based on the rulings made by the first judge at the March 17, 1995 hearing.

The motion for leave to amend is required by the court rule to be liberally granted and without consideration of the ultimate merits of the amendment. *City Check Cashing v. Nat. State Bank,* 244 *N.J.Super.* 304, 308–09, 582 *A.*2d 809 (App.Div.), *certif. den.,* 122 *N.J.* 389, 585 *A.*2d 391 (1990); *Tomaszewski v. McKeon Ford, Inc.,* 240 *N.J.Super.* 404, 411, 573 *A.*2d 501 (App. Div.1990). *See also R.* 4:9–1.

However, "[w]hile motions for leave to amend pleadings are to be liberally granted, they nonetheless are best left to the sound discretion of the trial court in light of the factual situation existing at the time each motion is made." *Fisher v. Yates,* 270 *N.J.Super.* 458, 467, 637 *A.*2d 546 (App.Div.1994). Significantly, "courts are

free to refuse leave to amend when the newly asserted claim is not sustainable as a matter of law. In other words, there is no point to permitting the filing of an amended pleading when a subsequent motion to dismiss must be granted." *Mustilli v. Mustilli,* 287 *N.J.Super.* 605, 607, 671 *A.*2d 650 (Ch.Div.1995).

Plaintiff filed a reply certification dated December 7, 1994, in opposition to defendants' cross-motion. Objection to the filing of an amended complaint on the ground that it fails to state a cause of action should be determined by the same standard applicable to a motion to dismiss under *R.* 4:6–2(e). *Maxim Sewerage v. Monmouth Ridings,* 273 *N.J.Super.* 84, 90, 640 *A.*2d 1216 (Law Div.1993). "This requires treating all the allegations of the pleading as true, and considering only whether those allegations are legally sufficient to establish the necessary elements of the claimed cause of action." *Id.* at 90, 640 *A.*2d 1216 (citing *Banks v. Wolk,* 918 *F.*2d 418 (3d Cir.1990)); *see also Printing Mart–Morristown v. Sharp Electronics,* 116 *N.J.* 739, 746, 563 *A.*2d 31 (1989).

The record does not reflect the reasoning prompting the court's denial of defendants' motion to amend. While the court clearly stated in the June 27, 1995 order that "the entry of this order is based on rulings made by [the first judge] on the record on 3–17–95," the transcript contains no commentary relating to the denial of defendants' motion to file a counterclaim. However, defendants' allegation that plaintiff violated the provisions of the Bank Holding Company Act are legally insufficient to establish the necessary elements of the claimed cause of action. As such, the trial judge's denial of defendants' motion was not an arbitrary exercise of discretion.

The relevant amendment of the Act provides in part:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . .

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit or trust service;

[12 *U.S.C.A.* § 1972(1)(C).]

Guarantors are "customers" for the purposes of application of the Bank Holding Company Act. *Swerdloff v. Miami Nat. Bank,* 584 *F.*2d 54, 59 (5th Cir.1978).

■■■ . In order to state a cause of action under the anti-tying provision of the Act, claimant must prove three elements: (1) that the bank had engaged in an unusual practice; (2) that the bank's actions were anti-competitive; and (3) that the actions were to the benefit of the bank. *Parsons Steel v. First Alabama Bank of Montgomery,* 679 *F.*2d 242, 246 (11th Cir.1982). It is most probable that the trial court found that defendants failed to state a cause of action under the Act. "Conditioning the extension of credit on measures designed to insure that the bank's investment is protected is well within traditional banking practices, and is not the kind of unusual or anti-competitive practice that gives rise to a [Bank Holding Company Act] cause of action." *New England Co. v. Bank of Gwinnett County,* 891 *F.Supp.* 1569, 1575 (N.D.Ga. 1995).

Plaintiff's imposed condition of replacing defendants' accountants was not unusual. "Courts have upheld a wide range of conditions placed upon debtors in efforts to protect the investment of the creditor-bank." *Ibid.* (citations omitted). The record demonstrates that, based on several developments, plaintiff was justly concerned with the stability of the lending relationship with NEEC. Thus, the bank's request was, if anything, traditional banking conduct, and not unusual in any respect.

The purpose of the Act is to prohibit anti-competitive tying arrangements, specifically in the field of commercial banking. *Kenty v. Bank One, Columbus, N.A.,* 92 *F.*3d 384, 394 (6th Cir.1996). Notably, the Act and its related amendments "were not intended to interfere with appropriate and traditional practices used by a bank to protect its investments." *Continental Bank of Pa. v. Barclay Riding Acad.,* 93 *N.J.* 153, 163, 459 *A.*2d 1163, *cert.*

*denied,* 464 *U.S.* 994, 104 *S.Ct.* 488, 78 *L.Ed.*2d 684 (1983); *see also Sterling Coal Co. v. United American Bank, etc.,* 470 *F.Supp.* 964, 965 (E.D.Tenn.1979)(stating that "[t]he Act does not prohibit attempts by banks to protect their investments" but, instead, "that the requirements be connected to the credit provided"). Moreover, "courts generally hold that the mere fact that a requirement imposed by a lender to protect its investment is an uncommon or unusual banking practice is not sufficient to constitute a violation of the Act." *Continental Bank of Pa., supra,* 93 *N.J.* at 165, 459 *A.*2d 1163; *see also B.C. Recreational Industries v. First Nat. Bank,* 639 *F.*2d 828 (1st Cir.1981), (holding bank's requirement that a debtor corporation hire a financial advisor in order to protect the financial investment of the bank did not constitute a prohibited tying arrangement).

"The proscribed benefit is one which results not from the legitimate protection of an investment, but from a 'misuse of the economic power of a bank.'" *Continental Bank of Pa., supra,* 93 *N.J.* at 167, 459 *A.*2d 1163 (citing *Swerdloff v. Miami Nat.,* 584 *F.*2d 54, 59 (5th Cir.1978)). There is nothing in the record indicating that the replacement accountants had any financial connection with plaintiff. Defendants' allegation of a prohibited economic tie-in is manifestly conclusory and without basis. Accordingly, the arrangement complained of falls within the range of appropriate traditional banking practices permissible under the Act.

Finally, the Term Loan Agreement clearly alerted defendants to the continuing nature of the relationship requiring, in part, production of fiscal documents as prepared by accountants who were "satisfactory to Interchange."

## VI.

Part of plaintiff's cross-appeal contests the court's determination to award post-judgment interest at the legal, as opposed to contractual, rate. Plaintiff urges that the parties contracted for a specific rate of interest to be applied to unpaid debt obligations,

and that rate should apply from June 28, 1996, until the judgment is satisfied in full. The contract rate of interest, as indicated by the promissory note, is plaintiff's "Base Rate" plus 2.5%. At the time the money judgment was entered, the "Base Rate" was 8.75%.[3] As such, the sum rate of interest of 11.25% (8.75% plus 2.5%) urged by plaintiff is substantially more than the 1996 legal rate of 5.5%.

Plaintiff references the trial court's discretion to award the contract rate of interest in lieu of the legal rate of interest under certain circumstances, and submits that those circumstances are present in the instant case. Specifically, plaintiff claims that an award of the legal rate would not only permit defendants "to benefit from their default," but would not make plaintiff "whole." Plaintiff bases its conclusion, in part, on the reasoning found in *R. Jennings Mfg. v. Northern Elec.*, 286 *N.J.Super.* 413, 669 *A.*2d 819 (App.Div.1995).

The trial court rejected plaintiff's argument, instead holding that "the only interest that's allowable is pursuant to Rule 4:42[–11], which is the post-judgment interest rule and it applies in this case as in all other cases unless there's some substantial reason why it shouldn't. And I see no reason in this case why it shouldn't."

 It is axiomatic that a judgment-creditor is entitled to interest on an unsatisfied judgment. *Simon v. N.J. Asphalt & Paving Co.*, 123 *N.J.L.* 232, 234, 8 *A.*2d 256 (Sup.Ct.1939)(citing *Erie Railway Co. v. Ackerson*, 33 *N.J.L.* 33 (Sup.Ct.1868)). New Jersey case law distinguishes between pre-judgment interest as a discretionary allowance, and post-judgment interest to which a litigant is entitled as of right. *Bd. of Educ., City of Newark*,

---

[3] The promissory note states that the applicable interest rate is "[t]o be paid per attached Schedule A." Schedule "A" dictates that the agreed rate of variable interest will be computed at 2.5% above the "Bank's Base Rate" as "the rate of interest announced from time to time by Interchange State Bank as its 'Base Rate' or 'Base Lending Rate.'"

*Essex Cty. v. Levitt,* 197 *N.J.Super.* 239, 244–45, 484 *A.*2d 723 (App.Div.1984). New Jersey courts have a longstanding policy of deciding "questions pertaining to interest according to the plainest and simplest considerations of justice and fair dealing." *Brown v. Home Development Co.,* 129 *N.J.Eq.* 172, 177, 18 *A.*2d 742 (Ch. 1941); *John Agnew Co. v. Paterson Bd. of Education,* 83 *N.J.Eq.* 49, 67, 89 *A.* 1046 (Ch.), *aff'd,* 83 *N.J.Eq.* 336, 90 *A.* 1135 (E. & A.1914).

*Rule* 4:42–11(a) provides:

Except as otherwise ordered by the court or provided by law, judgments, awards and orders for the payment of money, taxed costs and counsel fees shall bear simple interest as follows:

. . . .

(ii) . . . the annual rate of interest shall equal the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Cash Management Fund (State accounts) as reported by the Division of Investment in the Department of the Treasury.

The comment to the rule has been interpreted to permit trial courts the discretion to award a higher rate of interest when such award would be "fair and equitable." *See Mid–Jersey Nat. Bank v. Fidelity Mortgage Investors,* 518 *F.*2d 640 (3d Cir.1975). "When the legal rate is less than the contract rate it may be equitable to allow interest to run on the judgment at the contract rate to avoid prejudice to a mortgagee caused by delays in satisfying the judgment." *Shadow Lawn Sav. and Loan Ass'n v. Palmarozza,* 190 *N.J.Super.* 314, 318, 463 *A.*2d 384 (App.Div.1983). The annual rate of interest commencing January 1, 1996 and for the remainder of that calendar year was 5.5%. Pressler, *Current N.J. Court Rules,* Publisher's Note on *R.* 4:42–11 (1997). According to plaintiff's submissions, the applicable contract rate would be 11.25%.

In *R. Jennings Mfg. v. Northern Elec., supra,* we entertained a case wherein the creditor sought interest at the contract rate. The creditor's contention was that the agreed rate of interest is applicable to the outstanding debt, up until the time of payment, even if a judgment were rendered. 286 *N.J.Super.* at 416, 669

*A*.2d 819. The creditor cited to *Estate of Kolker,* 212 *N.J.Super.* 427, 515 *A*.2d 286 (Law Div.1986) and *Shadow Lawn Sav. & Loan Ass'n v. Palmarozza,* 190 *N.J.Super.* 314, 463 *A*.2d 384 (App.Div. 1983), as cases which supported this proposition. We, however, concluded that neither *Kolker* nor *Shadow* furthered the creditor's position. Under *Kolker,* the court addressed the applicable rate of interest for three classes of creditors. The various claims included "(A) those by creditors with judgments; (B) those by creditors whose claims include interest created by contract; (C) all other claims." *Kolker, supra,* 212 *N.J.Super.* at 438, 515 *A*.2d 286. The trial judge concluded that a judgment creditor would be limited to recovery of interest pursuant to *R.* 4:42–11(a), whereas a contract creditor would be entitled to interest in accordance with the terms of the underlying contract. *Id.* at 438–39, 515 *A*.2d 286.

In *R. Jennings Mfg.* the creditor "fail[ed] to distinguish between a contract creditor with a judgment and one without a judgment. The former is not a contract creditor at all but a judgment creditor subject to the rule." *R. Jennings Mfg., supra,* 286 *N.J.Super.* at 417, 669 *A*.2d 819. We reasoned "that a judgment extinguishes the original cause of action and makes available a new cause of action on the judgment, which constitutes a higher form of security." *Ibid.* (citing *Caterpillar Tractor Co. v. International Harvester Co.,* 120 *F*.2d 82, 87 n. 4 (3d Cir.1941); *Titus v. Miller,* 132 *N.J.Eq.* 541, 543, 29 *A*.2d 550 (Ch.1942)). Thus, "disparate interest rates [are] applied by the cases to contract claims prior to, and after, judgment." *R. Jennings Mfg., supra,* 286 *N.J.Super.* at 417, 669 *A*.2d 819.

An example of this disparate determination of interest rates can be found in *Shadow Lawn, supra,* 190 *N.J.Super.* at 318, 463 *A*.2d 384. This court ultimately applied the contract rate of interest from the date of default and acceleration of the debt, and the legal rate after entry of judgment. Notably, however, we also incorporated an "equitable" component in reaching our decision. Specifically, we referenced the fact that "the trial court had ordered the entry of final judgment on March 26, 1980 in an 'approximate sum'

subject to the exact amount being determined in further proceedings." *Id.* at 318, 463 *A.*2d 384. The trial court did not fix the amount due until July 30, 1981. We stated *"[b]ecause of the equities in the case,* we will treat July 30, 1981 as the date on which final judgment was entered, *since the contract interest rate [9.5%] exceeded the legal interest rate of 8% which was in effect* from April 1, 1975 to September 13, 1981." *Ibid.* (emphases provided).

The *R. Jennings* court also noted with approval a Third Circuit decision where, under factually similar circumstances to the case at bar, a bank sought to recover amounts due on a note. *R. Jennings Mfg., supra,* 286 *N.J.Super.* at 418, 669 *A.*2d 819. We cited *Mid–Jersey Nat. Bank v. Fidelity–Mortgage Investors,* 518 *F.*2d 640 (3d Cir.1975), wherein the court, in interpreting *R.* 4:42–11(a), applied the contract rate of interest up until the time judgment was entered, and "the rate specified in the Court Rules thereafter." *Ibid.; see Mid–Jersey Nat. Bank, supra,* 518 *F.*2d at 645–646. That case summary is, however, somewhat misleading given the fact that the *Mid–Jersey* court specifically rejected the district court's award fixing post-judgment interest at the legal rate. In fact, the Third Circuit opted instead to remand on the issue of post-judgment interest, instructing the district court to "set an appropriate rate ... in light of equitable considerations and the New Jersey court rule." [4] *Mid–Jersey Nat. Bank, supra,* 518 *F.*2d at 646.

In *Mid–Jersey,* defendant had been required to place a $300,000 security with the district court in order to perfect its appeal. Defendant met this obligation by depositing in court a certificate of deposit, placed with a commercial bank, which earned a rate of

---

[4] The legal rate was amended two months before the decision in *Mid–Jersey.* At the time the district court judgment was entered, the New Jersey rule set post-judgment interest at 6% "except as otherwise ordered by the court." The rate, however, was amended to provide for a post-judgment interest rate of 8%. *Mid–Jersey Nat. Bank v. Fidelity Mortgage Investors,* 518 *F.*2d 640, 645 n. 13 (3d Cir.1975).

8.25%. The legal rate was 6% at the time. The Third Circuit expressed "grave doubts ... concerning the equity in allowing [defendant] to profit in this fashion from the prosecution of an appeal, while [plaintiff] remains inadequately compensated for the use of its money." *Mid–Jersey Nat. Bank, supra,* 518 *F.*2d at 646. The court noted that "[f]or each period of delay, the differential in the rates of interest ... leaves [plaintiff] in a relatively worse position than before." *Ibid.*

In sum, while case law suggests that fixing post-judgment interest at the legal rate is the standard, the analysis adopted by the courts in reaching their decisions clearly incorporates an equitable component. In the instant case the court's analysis, in its entirety, consisted of an acknowledgement that *R.* 4:42–11(a) applies "unless there's some substantial reason why it shouldn't," and a conclusion that the court saw "no reason in this case why it shouldn't."

Plaintiff argues that the circumstances of this case justify post-judgment interest at the contract rate. To rule otherwise, plaintiff claims, would be to leave it with an inadequate remedy in that it would not be made whole, and it would further permit the defendants to benefit by their default despite the trial court entering judgment against them. The mere fact that the plaintiff has succeeded and been awarded judgment should not necessarily confer a benefit on the defendants by reducing their interest rate, especially where defendants expressly stated in the trial court that they intended to take this appeal and seek a stay of enforcement of the judgment by reason thereof.

A ruling in plaintiff's favor on this issue would be appropriate since one of the factors which the *Jennings* court found weighing in favor of the legal rate does not exist herein. Specifically, the *Jennings* court considered the fact that the judgment awarded to the plaintiff therein constituted a "higher form of security" than the unsecured book account upon which the plaintiff therein was suing. Such is *not* the case at bar. The loan involved in this case is a secured commercial loan transaction collateralized by various

items. Among the collateral is a mortgage on the home of defendants which, according to plaintiff's valuation, has $700,000 in equity. Defendants' valuation shows their residence has an equity of $900,000. Thus, the judgment to be entered against defendants below does not provide plaintiff with a "higher form of security" than it had pre-judgment, in that the judgment lien which plaintiff is obtaining on the Rinaldi home is inferior to the mortgage lien which the plaintiff already has on the property, with that mortgage being worth between $700,000 and $900,000.

By analogy, this Rule concerning interest is the Rule which has been adopted by the Bankruptcy Code. 11 *U.S.C.A.* § 506(b) of the Code states as follows:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Under this provision, an oversecured creditor is entitled to postpetition interest on its claim only "to the extent of such interest, when added to the principal amount of the claim" does not exceed the value of the collateral. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 *U.S.* 365, 108 *S.Ct.* 626, 98 *L.Ed.*2d 740 (1988); *United States v. Ron Pair Enterprises, Inc.,* 489 *U.S.* 235, 109 *S.Ct.* 1026, 103 *L.Ed.*2d 290 (1989); *see also* Comment 11 *U.S.C.A.* § 506(b).

There is no reason why the same rule should not be adopted herein. Any oversecured judgment creditor (like plaintiff) should, generally, be awarded post-judgment interest at the contract rate. Plaintiff is oversecured and defendants' post-judgment motion for a stay pending appeal without posting a sufficient bond was granted because the motion judge accepted defendants' argument that plaintiff was oversecured and that, accordingly, no bond was necessary to protect plaintiff in the event of a stay. The supersedeas bond of $100,000, which the judge required defendants to post, was only to cover appellate costs and expenses, not

to cover the judgment itself. The judge should, at least, have considered these factors.

Given the cursory treatment of this issue by the trial court, we remand for the purpose of expounding upon the basis for the court's conclusion. Specifically, the court should "determine whether it would be equitable to allow interest to run on the judgment at the contract rate to avoid prejudice to the judgment creditor caused by delays in satisfying the judgment," as well as review the actions taken by each party in their respective attempts to obtain a timely satisfaction of the judgment or, if applicable, forestall such satisfaction. *R. Jennings Mfg., supra,* 286 *N.J.Super.* at 418, 669 *A.*2d 819.

We affirm on appeal; we remand on cross-appeal for the trial court to reconsider the issues of counsel fees and post-judgment interest rate. We do not retain jurisdiction.