199 N.J. Super. 584 (1984)
489 A.2d 1279
ROSEMARY DALY, PLAINTIFF,
v.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided December 11, 1984.
*586 Thomas E. Durkin, Jr. for plaintiff.
James M. Shaughnessy for defendant (Haythe & Curley; Krugman, Chapnick & Grimshaw, attorneys.)
NEWMAN, J.S.C.
Defendant, Paul Revere Variable Annuity Insurance Company has moved for summary judgment against plaintiff Rosemary Daly, the beneficiary of a $250,000 life insurance policy issued by Paul Revere in which her late husband John Daly was the insured.[1] Paul Revere has refused payment on the policy on the grounds of equitable fraud. Paul Revere maintains that the application for insurance contained material misrepresentations. In opposing the motion, the beneficiary does not argue that questions of fact exist as to the misrepresentations, but raises issues of first impression concerning the interpretation and application of N.J.S.A. 17B:24-3 a and c as to the admissibility in evidence of the application for the life insurance policy that was issued. The beneficiary contends the Paul Revere improperly converted an application for disability insurance into an application for life insurance and that Daly never in fact applied for life insurance with Paul Revere. As a consequence it is argued that the application should not be admissible in a suit based on the life insurance policy.
A recitation of the facts pertinent to this summary judgment motion which are not disputed is in order. The deceased, Daly, was the vice president of Morris Industries, Inc., Pomptom Plains, New Jersey. Morris Industries is a closely held corporation, entirely owned by the president Alvin Nochenson. Daly had been with Morris Industries 16 years and had extensive authority in the management of the business. His earned income, including pension and profit sharing was $149,000 a *587 year. Daly entered into an agreement with his employer in which Morris Industries promised to purchase life and disability insurance for him. In late October or early November 1981 Daly was contacted by Joseph Priester, a special agent with the New York Life Insurance Company. Priester was informed that Daly sought a $250,000 life insurance policy and a disability insurance policy.
Throughout the month of January 1982 Daly completed applications for insurance. First, on January 17, 1982 he completed part one of Paul Revere's application. Later, on January 19, 1982 he completed an application for life insurance with New York Life. Finally on January 25, 1982 Daly completed part two of Paul Revere's application. Paul Revere's application is a dual purpose application. It may be used for life insurance or health insurance. The sections completed by Daly clearly indicate it was to be used for disability insurance. Part two of Paul Revere's application is the section which contains an applicant's individual medical history. It is part two of Daly's application which Paul Revere alleges to contain material misrepresentations. Paul Revere does not contest the fact that the application completed by Daly on January 17 and 25, 1982 were originally to be used for disability insurance.
It should be noted that at some point New York Life declined to underwrite a life insurance policy for Daly. However, in late February or early March 1982 Priester was involved in negotiations with Michael Drew, an agent for Paul Revere, concerning Paul Revere possibly underwriting both life and disability insurance for Daly. When Paul Revere made the final decision to offer Daly both life and disability insurance is unclear. Nonetheless, on April 1, 1982 Paul Revere mailed out a disability policy for Daly with an issuance date of January 1, 1982. On April 8, 1982 Paul Revere issued a $250,000 life insurance policy on Daly's life. Daly received the policy on April 13, 1982. Attached to the life insurance policy was the Paul Revere application, parts one and two completed by Daly on January 17 and 25, 1982 respectively. Pursuant to the agreement between *588 Daly and his employer, Morris Industries promptly paid Paul Revere the required premiums. Less than a month after the issuance of the life insurance policy, on May 7, 1982, Daly died of hypertensive heart disease with acute coronary insufficiency superimposed on an old myocardial infarct (left-ventricular).
Paul Revere declined payment on the policy and the beneficiary brought suit for the $250,000 face value of the policy. Paul Revere has moved for summary judgment on two grounds. First, that part two of Daly's insurance application contained material misrepresentations, thereby entitling Paul Revere to rescind the policy based on equitable fraud. Formosa v. Equitable Life Assurance Society of U.S., 166 N.J. Super. 8 (App.Div. 1979), certif. den. 81 N.J. 53 (1979). Second, the failure of a condition precedent to the insurance contract that Daly's health at the time of the issuance of the policy remain the same as stated in the application. Prahm v. Prudential Insurance Co., 99 N.J.L. 288 (E. & A. 1923).
In part two of the application Daly represented, among other things, that he in the past five years had not had an xray, electrocardiogram, blood or urine test or any other lab test. He also claimed to have seen a doctor only once in the past five years and the examination was for treatment of a jogging injury he suffered in 1971. Daly alleged he had not been hospitalized for treatment or observation in the past five years. He represented he never had any known indication of treatment for chest pain, high blood pressure and diseases of the heart, blood vessels or lungs. At the bottom of both parts one and two of the application, just above his signature and in clear print, Daly acknowledged that to the best of his knowledge and belief all of the statements made in the application were true and that he understood the statements and the application would become part of any insurance policy issued on it.
Paul Revere served upon the beneficiary requests for admissions on August 19, 1983. The requests for admissions which included hospital and medical records detailed Daly's ten year *589 history of high blood pressure, heart illness and treatment. No response whatsoever to the requests for admission was made. By virtue of R. 4:22-1, Daly's long history of heart illness is deemed admitted.
The extensive documentation of Daly's illness and treatment shows that he was first admitted to Mountainside Hospital June 26, 1972 with acute chest pain. He was diagnosed as suffering from a myocardial infarction. While at Mountainside Hospital Daly had several electrocardiograms which indicated he had an "abnormal record." On August 8, 1972 Daly had a cardiac catheterization at St. Barnabas Medical Center. At the time of the cardiac catheterization Daly was diagnosed as suffering from both high blood pressure and two vessel coronary artery disease. Dr. Paul Reilly treated Daly for his heart condition from 1972 through 1981. Dr. Reilly prescribed aldomil to Daly in 1975 because he suffered from hypertension. Daly had a reaction to the aldomil on April 6, 1975 and was again admitted to Mountainside Hospital. At the hospital Daly's treatment for hypertension continued. From late 1979 until April 29, 1982 Daly was examined and treated by Dr. Norman L. Lasser at a heart attack prevention clinic located at the New Jersey College of Medicine. In conjunction with this treatment Daly had blood and urine tests. On August 11, 1980 Daly was given an exercise electrocardiogram at St. Michael's Medical Center. He was diagnosed as suffering from active ischemic heart disease. Beginning on or about May 2, 1980 through April 26, 1982 Daly was treated on several occasions by Dr. Harold T. Eisenman for actinic keratosis. Through 1981 and 1982 Daly was treated with naturetin, an anti-hypertension drug prescribed by Dr. Lasser.
It is not questioned that Daly failed to disclose this information on the application. Daly's failure to disclose the nature and extent of his heart illness constitutes a material misrepresentation as to which no question of fact exists. Paul Revere has grounds to revoke the policy based on equitable *590 fraud. Formosa v. Equitable Life Assurance Society of U.S., supra. Further, part one of the application, completed by Daly on January 17, 1982 stated the following condition precedent in plain clear language.
The insurance applied for will not take effect unless the issuance and delivery of the policy and payment of the first premium occur while the health of the proposed insured ... remains as stated in the Application.
It is uncontested that Daly's health at the time of issuance and delivery of the policy was not as stated in the application. The failure of this condition precedent to the insurance contract operates to remove the obligation of the insurance company to pay the value of the policy. Prahm v. Prudential Insurance Co. of America, 99 N.J.L. 288, 289 (E. & A. 1923); Levandoski v. Equitable Life Assurance Society, 103 N.J.L. 643, 644 (E. & A. 1927); Pisker v. Metropolitan Life Insurance Co., 115 N.J.L. 582, 588 (E. & A. 1935). If it were not for the novel legal issue raised by the beneficiary in regard to admissibility of the application under N.J.S.A. 17B:24-3a and -3c, the court's analysis could stop here and grant Paul Revere's motion for summary judgment.
The beneficiary admits that Daly applied to Paul Revere for disability insurance. However, she contends that questions of fact exist as to whether Daly ever even applied for life insurance with Paul Revere. More specifically, the beneficiary alleges Paul Revere is precluded from introducing into evidence the application Daly did complete because it was an application for disability insurance and not life insurance. In arguing this position, the beneficiary relies on the authority of N.J.S.A. 17B:24-3a which reads as follows:
No application for any life or health policy or annuity contract shall be admissible in evidence in any action relative to such a policy or contract, unless a copy of the application was attached to or endorsed upon the policy when issued.
The fact that the application completed by Daly on January 17 and 25, 1982 was attached to the life insurance policy when issued is not questioned. The beneficiary claims that since it was an application for a disability policy and not the application *591 for the life insurance it is inadmissible under the section N.J.S.A. 17B:24-3a which states "no application ... shall be admissible in any action relative to such policy ... unless a copy of the application was attached to ... the policy when issued." Emphasis supplied.
In order to construe N.J.S.A. 17B:24-3a, it is necessary to see where this section fits within the comprehensive revision that was undertaken by the enactment of the Life and Health Insurance Code of New Jersey in 1971, N.J.S.A. 17B:17-1 et seq. and the subsequent amendments in 1979, N.J.S.A. 17B:17-17 to -25, entitled the Life and Health Insurance Policy Language Simplification Act. Statutes that deal with the same subject matter and which seek to obtain the same overall legislative purpose should be read in pari materia. This is true even when the statutes were enacted at different times and do not make reference to one another. Mimkon v. Ford, 66 N.J. 426 (1975). Therefore N.J.S.A. 17B:24-3a must be interpreted within the context of the purposes and goals of Title 17B and its later amendments.
Title 17B and the 1979 amendments represent the Legislature's desire to enact consumer oriented legislation. The purpose of the legislation was to codify the requirements for issuing life and health insurance and to make the insurance contract more readable and understandable to the purchaser.[2] The overall goal was to protect the consumer from an insurance company improperly refusing to pay policy claims. In order to further these goals N.J.S.A. 17B:17-21 requires all policies and forms to achieve certain minimum scores on the Flesch reading *592 ease test, a test designed to ascertain the readability of language. To insure that the policies and forms are fair and readable N.J.S.A. 17B:25-18a mandates that all policy and application forms are to be filed with the Commissioner of Insurance. The commissioner may disapprove the use of such forms if he finds they contain provisions which are unjust, unfair, inequitable, misleading, contrary to law or to the public policy of New Jersey. N.J.S.A. 17B:25-18h.[3] The policy forms must conform to the requirement of New Jersey law before they may be used in the State. N.J.S.A. 17B:25-2 states in part, "[n]o policy of life insurance ... shall be delivered or issued for delivery in this state unless it contains in substance all the applicable provisions specified in sections 17B:25-3 to 17B:25-14 inclusive." Included within this group of statutes is N.J.S.A. 17B:25-2.1 which requires that all life insurance policies contain a provision which allows the insured to cancel the policy and receive a full refund of all money paid within ten days after receipt of the policy. Considered in this context the purpose of N.J.S.A. 17B:24-3a was to retain all of the insured's statements in front of him and to make sure the insured was aware that the statements in the application became part of the policy.
Here, the purposes of Title 17B, the 1979 amendments, and more specifically of N.J.S.A. 17B:24-3a have been satisfied by the insurance contract. The application was attached to the policy. The insurance policy and application are printed in plain understandable language. The cover page of the policy notified *593 Daly he could reject the policy within ten days by stating in large print;
(TEN DAY RIGHT TO EXAMINE POLICY) If you are not satisfied with your policy, return it to us or the agent or agency office from which it was purchased within 10 days after you receive it. We will refund any premium you have paid. The policy will be considered to be void from its beginning.
Paul Revere has complied with all of the New Jersey statutes which require filing and approval of all form applications and policies. The application informed Daly twice in clear readable print that it would become part of any insurance policy issued on it. Directly above Daly's signature on part one of the application it states:
I have read the statements and answers recorded ... They are to the best of my knowledge and belief true.. They will become part of this application and any policy(s) issued on it. [emphasis supplied]
Part two, the medical application, contains similar language just above the applicant's signature. It provides:
I have read the statements and answers made above. They are to the best of my knowledge and belief, true and complete and correctly recorded. I understand that they will become a part of my application to insurance and any policy issued on it. [emphasis supplied]
Absent an ambiguity the court has no right to disregard the plain terms of an insurance policy. Petronzio v. Brayda, 138 N.J. Super. 70, 75 (App.Div. 1975). The words in an insurance policy should be given their common meaning. Rudolph v. Home Indemnity Co., 138 N.J. Super. 125, 136 (Law Div. 1975). The language in the application is unambiguous. It plainly indicates that it may be used for any insurance policy issued on it. Insurance contracts are a matter of public concern; however, when the policy form complies with the requirements of law the parties are bound to it as in any other private contractual agreement. Dikowski v. Metropolitan Life Insurance Co., 128 N.J.L. 124, 128 (E. & A. 1942).
The fact that Daly first completed the application for the purpose of obtaining disability insurance is not material in the determination of whether Paul Revere complied with the mandates of N.J.S.A. 17B:24-3a. It is undisputed that the application *594 completed by Daly was attached to the life insurance policy issued to him. The commissioner has approved of the use of this particular application. Daly had a duty to read the policy and application and if it did not comply with his wishes to notify the company. Citizens Casualty Co. v. Zambrano Co., Inc., 140 N.J. Eq. 378 (Ch. 1947), aff'd 141 N.J. Eq. 310 (E. & A. 1948); Martinez v. John Hancock Mutual Life Insurance Co., 145 N.J. Super. 301 (App.Div. 1976), certif. den. 74 N.J. 253 (1977). The fact that Paul Revere used the disability application as an application for life insurance does not violate any of the mandates of Title 17B or more specifically N.J.S.A. 17B:24-3a. The dual purpose use of the application is unambiguous as stated in both parts one and two of the application. Since this application complies with the law the insured must be bound by its plain terms. Where, as here, it has been established that Paul Revere complied with N.J.S.A. 17B:24-3a, the application is admissible into evidence.[4]
The beneficiary also sought to exclude the application on the basis of N.J.S.A. 17B:24-3c which provides:
No alterations on any written application for any such policy or contract be made by any person other than the applicant without his written consent, except that insertions may be made by the insurer, for administrative purposes only, in such a manner as to indicate clearly that such insertions are not to be ascribed to the applicant.
*595 There were no alterations made to the application signed by the insured other than the insertions written by Paul Revere in an area marked "Corrections and Amendments (For Home Office Use Only)." This particular section was filled in by Robert Garrity of Paul Revere's home office in Worcester, Massachusetts. Nor was the attachment of the application to the life insurance policy an alteration within the contemplation of N.J.S.A. 17B:24-3c as construed. N.J.S.A. 17B:24-3c can therefore not serve to bar the application attached to the issued policy from evidence.
In summary, New Jersey has been sensitive to the need to protect the consumer who buys insurance. N.J.S.A. 17B:17-1 et seq. represents the Legislature's efforts to protect the consumers of life and health insurance. The courts have also responded to the need to protect the purchasers of insurance by interpreting any ambiguity in an insurance policy in favor of the insured. See, e.g., State Farm Mutual Auto v. Toro, 127 N.J. Super. 223, 226 (Law Div. 1974).
By the same token, the New Jersey courts have consistently held that an insurance contract may be rescinded on the grounds of equitable fraud as well as legal fraud. Formosa, supra, 166 N.J. Super. at 13; see, e.g., Equitable Life Assurance Society v. New Horizons, Inc., 28 N.J. 307, 312-313 (1958); Gallagher v. New England Mutual Life Insurance Co. of Boston, 19 N.J. 14, 20 (1955); Metropolitan Life Insurance Co. v. Tarnowski, 130 N.J. Eq. 1, 3 (E. & A. 1941); Metropolitan Life Ins. Co. v. Lodzinski, 124 N.J. Eq. 357, 359 (E. & A. 1938). The beneficiary of an insured should not be allowed to profit based on the insured's misrepresentation. The extent of the fraud Daly attempted to perpetrate upon Paul Revere is indelibly clear. He tried to pass himself off as a healthy person when in fact he had an underlying heart condition. While it is not necessary that the insured's cause of death be related to the misrepresentation that he has made in order for the policy to be rescinded, Formosa, supra, it presents an even stronger case *596 where there have been misrepresentations directly related to the cause of death. This is such a case. The life insurance policy issued on Daly's life is rescinded.
Paul Revere's motion for summary judgment dismissing the complaint with prejudice, is granted.
NOTES
[1] For purposes of reference throughout this opinion, Paul Revere Variable Annuity Insurance Company will be referred to as Paul Revere, Rosemary Daly as the beneficiary, and John Daly, as Daly.
[2] The purpose of the Life and Health Insurance Policy Language Simplification Act, L. 1979, c. 167 is contained in the statement to the bill issued by the Assembly Banking and Insurance Committee. The committee states: "[t]his [bill] is designed to make the insurance contract more readable, hence more understandable, to the purchaser." N.J.S.A. 17B:17-18 reaffirms this goal by stating, "[t]he purpose of this act is to establish minimum standards for language used in policies ... or ... to facilitate ease of reading by insured." N.J.S.A. 17B:17-18.
[3] In 1977, 2000 individual health insurance policy forms were submitted to the Commission of Insurance. Sixty-five % of the initial submissions were rejected by the department for failing to meet the appropriate standards. Each health insurance policy form received an average of one and one half hours review and only 35% were filed as submitted. Health Insurance 1978: Hearings Before the Assembly Banking and Insurance Committee (1978) (Statements of Commissioner Sheeran, Department of Insurance at 2 and William A. White, Chief Actuary, Department of Insurance at 10).
[4] The beneficiary has attempted to support her position by reliance on Pennsylvania authority. Although Pennsylvania has a detailed insurance code, 40 P.S. § 1-3111, its terms differ from N.J.S.A. 17B:17-1 et seq. Pennsylvania has not adopted an insurance policy language simplification act. As a consequence, the concerns addressed in Syme v. Bankers National Life Insurance Company, 393 Pa. 600, 144 A.2d 845 (1958), which precluded the introduction of the application into evidence based on similar facts, are met by N.J.S.A. 17B:17-1 et seq. which calls for a readable and understandable insurance contract. Furthermore, aside from the obvious differences in language used in N.J.S.A. 17B:24-3a and the purported comparable Pennsylvania statute, 40 P.S. § 441, Pennsylvania case authority construing Pennsylvania statutes is not binding on New Jersey courts construing New Jersey statutes. Danek v. Hommer, 14 N.J. Super. 607, 615 (Cty.Ct. 1951), aff'd 9 N.J. 56 (1952).