876 A.2d 858 (2005)
379 N.J. Super. 18
Empress Nazirah Ashanti WEBB, a minor, by her parents and natural guardians, Crystal Webb and Charles E. Harris; Crystal Webb and Charles E. Harris, individually, Plaintiffs,
v.
Karen WITT, M.D., Virginia Carney-Nelson, M.D., Defendants, and
Susan I. Kaufman, D.O., Defendant-Appellant, and
Cooper Hospital/University Medical Center, Defendant/Third Party Plaintiff-Respondent,
v.
Lexington Insurance Company, Third Party/Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 2004.
Decided July 8, 2005.
*860 Steven I. Kern, Bridgewater, argued the cause for appellant (Kern, Augustine, Conroy & Schoppmann, attorneys; Mr. Kern, on the brief).
Warren W. Faulk, Westmont, argued the cause for respondent Cooper Hospital/University Medical Center (Brown & Connery, attorneys; Mr. Faulk, on the brief).
Joseph A. Martin, Haddonfield, argued the cause for respondent Lexington Insurance Company (Archer & Greiner, attorneys; Kerri E. Chewning and Mr. Martin, on the brief).
Lawrence Downs, Director, attorney for amicus curiae The Medical Society of New Jersey (Mr. Downs, of counsel and on the brief).
Before Judges A.A. RODRÍGUEZ, CUFF and WEISSBARD.
The opinion of the court was delivered by:
RODRÍGUEZ, A. A., P.J.A.D.
This case presents a novel issue: whether a physician or health practitioner has the right to exercise control over a settlement between a medical malpractice insurer and a claimant, where the physician is afforded coverage by the insurer, but has no express contractual right to approve the settlement. We hold that such a physician or practitioner has no right to object to the settlement, nor to demand an apportionment of his or her responsibility before the settlement is reported to either the National Practitioner Data Bank (NPDB) or the New Jersey Division of Consumer Affairs pursuant to N.J.S.A. 45:9-22.21 to -22.25.

I
Empress Nazirah Ashanti Webb (the infant) was born at Cooper Hospital/University *861 Medical Center (the Hospital) on August 28, 1999. It is alleged that as a result of medical malpractice, the infant sustained an injury to the brachial plexus, which caused a permanent loss of use of her right arm. The infant and her parents, Crystal Webb and Charles E. Harris (collectively "plaintiffs"), sued the Hospital and three physicians, Susan I. Kaufman, D.O., the attending obstetrician, Karen Witt, M.D., the attending intern, and Virginia Carney-Nelson, M.D., the chief resident at the time of the delivery. Kaufman, Witt, and Carney-Nelson were all employed by the Hospital.
The Hospital was the sole named insured in a policy issued by Lexington Insurance Company (Lexington). The policy afforded coverage to Kaufman, Witt, and Carney-Nelson as "other insureds." The policy further provided that Lexington must obtain consent from the named insured, the Hospital, before settling any litigation. However, Lexington need only make "a reasonable attempt to consult with the [other] Insured[s]," Kaufman, Witt, and Carney-Nelson.[1]
Pre-trial discovery revealed the following disputed facts. Carney-Nelson testified at her deposition that Witt delivered the infant's head. Then, Carney-Nelson suctioned the infant's mouth and noticed that there was a shoulder dystocia (i.e., the shoulders were not passing under the pelvic bone). Kaufman tried to tell Witt what maneuvers to perform. According to Carney-Nelson, Witt "was turning the baby's head instead of rotating the shoulders." Kaufman yelled at Carney-Nelson to put her gloves on. However, the baby crowned much faster than Carney-Nelson expected. With her gloves on, Carney-Nelson showed Witt how to do a "Woods" maneuver, a technique used to disimpact the shoulder. Carney-Nelson remembered that Kaufman was "telling Witt to rotate the baby, meaning the Woods maneuver," but instead Witt rotated the baby's head by ninety-degrees. Kaufman got upset and told Carney-Nelson to "get in there." Carney-Nelson took over, performed the Woods maneuver, and finished the delivery.
Kaufman's deposition testimony was consistent with that of Carney-Nelson's, except that she denied yelling. Kaufman recalled that after the head was delivered, Witt had a problem reducing the anterior shoulder. Kaufman remembered that Carney-Nelson stepped in, performed the Woods maneuver, and assisted in the entire delivery.
Witt's deposition testimony was discrepant. According to Witt, it was Kaufman who delivered the baby's shoulders. Witt insisted that Kaufman instructed her to turn the infant's head. Confused by Kaufman's directions, Witt stepped out of the way instead of asking for clarification because "time was of the essence." Witt confirmed that she turned the infant's head.
Plaintiff's expert, Anthony C. Quartell, M.D., opined that Witt was instructed "to twist and rotate a baby's head in order to disimpact its shoulders" .... which was "a completely inappropriate and dangerous maneuver and is in all degree of medical *862 probability the causative action in the injury to this baby's brachial plexus." He further opined that both Carney-Nelson and Kaufman "are [at fault] of practicing substandard medicine in that they either instructed or allowed an intern to perform a dangerous and injurious maneuver on a baby's head when they were standing right next to the intern."
Two experts retained by defendants, Herbert F. Sandmire, M.D., and Joel I. Polin, M.D., disagreed. Sandmire found that there were "no deviations from the acceptable standards of care in the delivery," and that "nothing the physicians did or failed to do caused the injury." Sandmire reported that there is no evidence that doctors can prevent brachial plexus injuries, and that there is a correlation between such injuries and a rapid second stage of labor, as occurred in this case. Polin opined that the delivery was managed in accordance with a high standard and that a brachial plexus injury does not imply improper management of shoulder dystocia. Rather, Polin reported, a brachial plexus injury may occur in the absence of shoulder dystocia, when shoulder dystocia is managed perfectly, and in cesarean births.
According to Lexington's brief, it "determined that consideration of a possible settlement of the plaintiffs' claims was the appropriate course of action and in the best interests of [its] insureds." However, Kaufman communicated to Carolyn R. Sleeper, Esq., the attorney appointed by Lexington to represent all defendants, that she did not wish settlement on her behalf. Sleeper advised Kaufman that the insurance contract did not require her consent to settle and suggested that Kaufman retain personal counsel. Later, it became apparent that there were conflicts in representation of all defendants by one counsel. Therefore, Sleeper and her firm (Parker, McCay & Criscuolo, P.A.), withdrew from representation. Lexington appointed Stahl & DeLaurentis, P.C., as counsel for Kaufman and Earp Cohn, P.C. to represent Witt and Carney-Nelson. In addition, Kaufman retained Kern, Augustine, Conroy & Schoppmann, P.C. as her personal counsel.
The Hospital successfully moved for leave to file a third party complaint against Lexington, a cross-claim against Kaufman, and a counterclaim against plaintiffs, seeking a declaratory judgment that only its consent is needed in order for Lexington to settle the case on behalf of all insureds. The Hospital then moved for summary judgment on its third party claim. Kaufman cross-moved, seeking to bar the Hospital and Lexington "from apportioning liability to [her] in connection with any settlement of this case." The judge granted the Hospital's motion and denied Kaufman's cross-motion because she had not previously filed an affirmative claim against the Hospital or Lexington.
Kaufman then moved for leave to file an amended answer to the Hospital's cross-claim and a fourth party complaint against Lexington. These proposed pleadings sought to preclude Lexington from settling the case, absent Kaufman's consent or "an adjudication by the Court, with respect to [her] liability, if any." Kaufman also sought compensatory damages, costs and attorney's fees. Kaufman alleged in the proposed amended pleading that the reporting of a settlement with undivided responsibility for all three doctors would cause:
[A]dverse consequences to her participation and/or memberships in health insurance organizations, HMO's and/or managed care organizations; adverse consequences to her memberships in the medical staffs of other hospitals at which she maintains privileges, a reduction or *863 elimination of her ability to secure employment as a physician, a reduction or elimination of her ability to provide obstetric and gynecological services and, ultimately, a reduction or elimination of her ability to practice medicine.
In support of the motion, Kaufman submitted the certification of Morgan McLachlan, a professional liability insurance expert. He certified that if Lexington settled the case and reported it to the NPDB as representing the undivided responsibility of the three physicians, Kaufman "will find it extremely difficult, if not impossible, to obtain professional liability insurance coverage" in the future. He added that:
If she is able to obtain coverage, the premiums will increase to a point where it may be unaffordable, forcing Dr. Kaufman out of the practice of obstetrics. Obstetrics is, of course, a specialty which is subject to high malpractice premium rates, even for physicians with clean records. For a physician to have such a settlement on her record, even where she has a reasonable explanation and no liability, will result in severe, negative consequences to her ability to obtain professional liability coverage.
The judge denied Kaufman's motion, concluding that "there is no material meritorious claim asserted by [Kaufman] that [is] sustainable as a matter of law."

II
We granted Kaufman's motion for leave to appeal.[2] On appeal, Kaufman contends that: (1) the judge erred by applying the wrong standard and denying her motion for leave to file an amended pleading; (2) Lexington is required to apportion responsibility among the defendants so that liability percentages would be accurately reported to federal and state data banks; (3) an insurance policy provision that affords one insured the right to settle, but denies that right to other insureds, violates public policy; and (4) Lexington breached its fiduciary duty to Kaufman by failing to seek her approval of the settlement.
By leave granted, the Medical Society of New Jersey (Society), filed a brief and participated in oral argument as amicus curiae.[3] The Society urges reversal of the judge's order. It contends that "an insurance carrier must not be given unfettered discretion to settle a medical malpractice action without giving due consideration to the impact of such settlement upon the affected physician, and without some mechanism in place, consistent with the requirements of due process, to protect the physician's interests." We are not persuaded by these contentions.

III
Kaufman first raises a procedural argument, that the judge applied an incorrect standard in denying her motion to amend her pleadings and impermissibly accepted the Hospital's and Lexington's version of the facts, instead of the version alleged in her proposed pleadings. Our review leads us to the conclusion that the denial of Kaufman's motions was the correct decision.
Pursuant to R. 4:9-1, leave to amend a pleading should be "freely given in the interest of justice." A motion for leave should be decided pursuant to the same standard as a motion to dismiss for failure to state a claim. Maxim Sewerage *864 Corp. v. Monmouth Ridings, 273 N.J.Super. 84, 90, 640 A.2d 1216 (Law Div.1993). All of the allegations in the pleading must be accepted as true. Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989). Plaintiffs are entitled to every reasonable factual inference. Indep. Dairy Workers Union of Hightstown v. Milk Drivers and Dairy Employees Local No. 680, 23 N.J. 85, 89, 127 A.2d 869 (1956). The judge should consider only whether those allegations are legally sufficient to establish the necessary elements of the claimed cause of action. Printing Mart-Morristown, supra, 116 N.J. at 746, 563 A.2d 31. In doing so, the judge must examine the complaint "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim." Ibid. (citing DiCristofaro v. Laurel Grove Mem'l Park, 43 N.J.Super. 244, 252, 128 A.2d 281 (App. Div.1957)). If necessary, an opportunity to amend should be allowed. Ibid.
However, where the proposed cause of action is not sustainable as a matter of law, the judge may refuse leave to amend. Interchange State Bank v. Rinaldi, 303 N.J.Super. 239, 256-57, 696 A.2d 744 (App.Div.1997). In other words, "there is no point to permitting the filing of an amended pleading when a subsequent motion to dismiss must be granted." Ibid. (citing Mustilli v. Mustilli, 287 N.J.Super. 605, 607, 671 A.2d 650 (Ch.Div. 1995)).
Applying that standard here, we conclude that Kaufman's motions to amend her pleadings to assert affirmative claims against the Hospital and Lexington were properly denied. Giving Kaufman the benefit of all inferences, we conclude that she has failed to state a cause of action for which there is a legal or equitable remedy available.

IV
As for the substantive arguments, we note at the outset that Kaufman's main concern does not appear to be the settlement itself, but rather how it is reported to the federal and state databanks. Clearly, her interests are served by a settlement of the claims, so long as the reported percentage of her responsibility is zero. Kaufman offers three theories of law to support her claim that Lexington cannot report her liability to any extent, unless she either consents to the reported percentage of responsibility or there is an apportionment of her percentage in an independent process such as an arbitration. We are not persuaded by her arguments.
Kaufman's first theory is that some sort of independent process to determine liability apportionment is mandated by federal law and/or regulation. We disagree. As part of the Health Care Quality Improvement Act of 1986, 42 U.S.C.A. §§ 11101 to -11152 (2005), Congress created the NPDB as a means of making information about medical providers accessible. 42 U.S.C.A. § 11131a. Insurers must report all settlements, along with the names of any physicians for whose benefit payments are made, the amount of the payments, the names of the hospitals with which the physicians are affiliated and a description of the acts or omissions and injuries alleged in the claim. 42 U.S.C.A. § 11131(b); 45 C.F.R. § 60.5(a) (1990). The statute is silent on apportionment among multiple defendants.
The Health Resources & Services Administration of the Department of Health and Human Services (HHS) has published a NPDB Guidebook. The Guidebook states that:
In the case of a payment made for the benefit of multiple practitioners, wherein *865 it is impossible to determine the amount paid for the benefit of each individual practitioner, the insurer must report, for each practitioner, the total (undivided) amount of the initial payment and the total number of practitioners on whose behalf the payment was made. In the case of a payment made for the benefit of multiple practitioners where it is possible to apportion payment amounts to individual practitioners, the insurer must report, for each practitioner, the actual amount paid for the benefit of that practitioner.
[Official National Practitioner Data Bank Guidebook, Chapter E (September 2001).]
Kaufman argues that the language in the Guidebook requires an independent fact-finding process to fix the percentage of her responsibility, if any. We disagree. First, we note that the Guidebook does not have the force of law, nor is it a regulation. The Guidebook is merely an informational publication. Second, and more importantly, the Guidebook does not provide what Kaufman argues it does. The Guidebook is silent as to how a determination of liability apportionment is to be decided and in what forum. Third, even where apportionment is possible, the responsibility to determine that apportionment is placed on the insurer. Further, there is no indication that a practitioner can dispute an apportionment.
However, a practitioner "may dispute the accuracy of information in [NPDB] concerning himself or herself." 45 C.F.R. § 60.14 (1989). If the NPDB voluntarily revises the information based on the practitioner's information, the HHS Secretary will notify all entities to whom reports have been sent that the original information has been revised. 45 C.F.R. § 60.14(c)(1). However, if the reporting entity does not revise the reported information the HHS Secretary will, upon request, review all of the written information submitted and will either: (i) include a brief statement by the practitioner describing the disagreement concerning the information, and an explanation of the basis for the decision that it is accurate; or (ii) if the HHS Secretary concludes that the information was incorrect, send corrected information to previous inquiries. That is the entire dispute procedure.
Consequently, we hold that neither the federal act, the regulations adopted thereunder, nor the Guidebook compel the relief that Kaufman seeks, i.e., an apportionment hearing. Furthermore, we cannot discern from these sources a federal mandate giving rise to a state cause of action for an insurer's decision not to apportion responsibility in a multi-defendant settlement.
There is a New Jersey statute that also regulates the reporting of medical malpractice settlements. The New Jersey Health Care Consumer Information Act became effective on June 23, 2004. N.J.S.A. 45:9-22.21 to -22.25. It requires that the State maintain a database containing a profile of every physician and podiatrist licensed to practice in the State. N.J.S.A. 45:9-22.22. This profile is accessible to the public. Ibid. Part of the profile will include a description of all settlements of malpractice claims in which payment was made to a complaining party on behalf of the practitioner. N.J.S.A. 45:9-22.23a(10). Practitioners will be classified according to whether their history of malpractice payments is "above average," "average" or "below average." N.J.S.A. 45:9-22.23a(10)(c). The profile must contain the following disclaimer:
Settlement of a claim and, in particular, the dollar amount of the settlement may occur for a variety of reasons, which do not necessarily reflect negatively on the professional competence or conduct of *866 the physician (or podiatrist or optometrist). A payment in settlement of a medical malpractice action or claim should not be construed as creating a presumption that medical malpractice has occurred.
[N.J.S.A. 45:9-22.23a(10)(d).]
There is a limited procedure for practitioners to correct "factual" errors. The procedure is as follows:
Before a profile is made available to the public, each physician, podiatrist or optometrist shall be provided with a copy of his profile. The physician, podiatrist or optometrist shall be given 30 calendar days to correct a factual inaccuracy that may appear in the profile and so advise the Division of Consumer Affairs or its designated agent; however, upon receipt of a written request that the [D]ivision or its designated agent deems reasonable, the physician, podiatrist or optometrist may be granted an extension of up to 15 calendar days to correct a factual inaccuracy and so advise the [D]ivision or its designated agent.
[N.J.S.A. 45:9-22.23c.]
If new information or a change in existing information is received by the Division, the practitioner shall be provided with a copy of the proposed revision and shall be given thirty calendar days to correct a factual inaccuracy. N.J.S.A. 45:9-22.23d.
Thus, for a practitioner who is dissatisfied with his or her apportionment of liability, or lack thereof, the sole statutory remedy is an opportunity to correct a factual error. This falls short of the apportionment process sought by Kaufman. We find no support or authority for this court to fashion a remedy greater than the one provided by the Legislature. The same applies to the remedy created by Congress for practitioners who disagree with a report submitted to the NPDB. Kaufman's request for broader remedies should be addressed to the federal and state legislative branches.

V
Kaufman's next theory is that it is against public policy for an insurance contract to provide one insured the right to veto settlements, while withholding that right from the other insureds. She argues that this is particularly so where the class of insureds who are denied the veto right had no involvement in the negotiation of the insurance contract. She also argues that the consequences of national and state reporting of settlements is damaging to physicians' reputations and careers. The Society joins in this argument, further pointing out that the reporting of settlements leads to higher malpractice insurance rates and diminished ability to secure privileges at hospitals. According to Kaufman and the Society, such reporting absent apportionment of liability, is against public policy not only because it is fundamentally unfair, but also because it will discourage experienced physicians from supervising residents, create tension between hospitals and physicians, and either drive physicians out of the State or deter them from practicing at all.
We must reject these arguments. We begin our analysis with the fundamental principle that an insurance policy is a contract, and like other contracts, the terms of the policy define the parties' rights and obligations. Mancuso v. Rothenberg, 67 N.J.Super. 248, 254, 170 A.2d 482 (App.Div.1961); Daly v. Paul Revere Variable Annuity Ins. Co., 199 N.J.Super. 584, 593, 489 A.2d 1279 (Law Div.1984), aff'd, 206 N.J.Super. 185, 502 A.2d 48 (App.Div.1985), certif. denied, 103 N.J. 504, 511 A.2d 674 (1986). As such, "[w]hen the terms of an insurance policy *867 are clear, the court's function is to enforce the written contract, and `should not write for the insured a better policy of insurance than the one purchased.'" Fairlawn Indus. Ltd. v. Gerling Am. Ins. Co., 342 N.J.Super. 113, 117, 775 A.2d 744 (App. Div.2001) (quoting Longobardi v. Chubb Inst. Co. of New Jersey, 121 N.J. 530, 537, 582 A.2d 1257 (1990)).
It is true that courts will not enforce a term of a policy that is contrary to public policy. Sparks v. St. Paul Ins. Co., 100 N.J. 325, 334, 495 A.2d 406 (1985). However, Kaufman has not shown that the absence of a consent to settle clause is against public policy. Some insurance contracts provide for a consent to settle clause because the parties specifically negotiate such term. However, many malpractice insurance policies do not contain such a provision. Presumably, the premium paid to the insurer reflects the presence or absence of a consent to settle clause. Thus, rather than identifying a public policy to support her argument, Kaufman has merely explained why it would be advantageous for her to have the policy reformed.
In fact, the remedy Kaufman seeks is counter to New Jersey's public policy of encouraging the settlement of litigation. See Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990) (explaining that settlement of litigation ranks high in our public policy); Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 35, 134 A.2d 761 (1957) (holding that New Jersey policy favors the settlement of litigation); Jannarone v. W.T. Co., 65 N.J.Super. 472, 476, 168 A.2d 72 (App.Div.), certif. denied, 35 N.J. 61, 171 A.2d 147 (1961) (holding that the settlement of litigation ranks high in our public policy). A veto power over settlements will impede rather than advance this public policy. Even where an insurer and claimant are prepared to settle, some cases will be tried to conclusion because the insured physician refuses to consent. This will cause unnecessary expenses to the parties and undue consumption of judicial time and resources. Lay and expert witnesses will have to testify in court under circumstances where a trial could have been avoided. More importantly, the result of such a trial may not be satisfactory to the claimant or the insurer.
We do not mean to suggest that consent to settle clauses in insurance policies are unenforceable. However, such a clause must be expressly stated; it cannot be implied. We will not reform a policy to include such a term.
Kaufman also argues that insurance policies are contracts of adhesion, imposed upon physicians with unfair terms. See Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992) (holding that because insurance policies are adhesion contracts, courts must be particularly vigilant in ensuring their conformity to public policy and principles of fairness). However, as we have already pointed out, a consent to settle provision is often a negotiated term in malpractice policies. The issue here is not the non-negotiability of the consent to settle term, but the fact Kaufman wants such a provision to be read into a policy that she did not negotiate or pay for. In short, she wants to alter a contract of which she is a third party beneficiary, simply because it will confer an additional benefit on her, not because it contravenes public policy.

VI
Kaufman's third theory is breach of a fiduciary duty. She argues that if Lexington effectuates a settlement without obtaining her consent, it will be in breach of its fiduciary duty to her by putting its own interest, as well as the Hospital's interest, before Kaufman's interest. We reject this argument.
*868 An insurer owes a fiduciary duty to its insured, Pickett v. Lloyd's, 131 N.J. 457, 467, 621 A.2d 445 (1993), and the relationship carries with it affirmative duties toward the insured. Sobotor v. Prudential Prop. & Cas. Ins. Co., 200 N.J.Super. 333, 337-41, 491 A.2d 737 (App. Div.1984). Where there is a clear conflict of interest between an insurer and an insured, a carrier may not, in the insured's name, so defend as to exculpate the carrier alone. Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 395, 267 A.2d 7 (1970). Further, where a carrier reserves control over settlement of claims against the insured, it has a duty to exercise good faith in settling such claims. Bowers v. Camden Fire Ins. Ass'n, 51 N.J. 62, 70-71, 237 A.2d 857 (1968). In discussing insurers' duties to their insureds, the case law does not distinguish between named insureds and additional insureds. See e.g., First Nat'l Bank of Palmerton v. Motor Club of Am. Ins. Co., 310 N.J.Super. 1, 708 A.2d 69 (App.Div.1997).
Despite an insurer's inherent fiduciary duty to exercise good faith in settling a case, the fact remains that the Lexington insurance policy does not expressly provide its other insureds with the right to consent to a settlement. As previously discussed in Part V of this opinion, the lack of such a provision is not contrary to public policy. This leads us to the conclusion that so long as the insurer does not procure a settlement in bad faith, it has not violated its fiduciary duties to its insureds solely by adherence to a policy that does not employ a consent to settle clause. See Am. Home Assurance Co., Inc. v. Hermann's Warehouse Corp., 117 N.J. 1, 7, 563 A.2d 444 (1989) (explaining that an insurer's obligation to exercise good faith depends upon the circumstances of the particular case). Here, there is no evidence of bad faith and thus, no breach of a fiduciary duty.

VII
The Society notes that in order to avoid the preclusive effect of the entire controversy doctrine, claimants usually sue every doctor and health care provider listed on their medical charts, regardless of the level of involvement attributable to each practitioner. Thus, the Society argues, practitioners who are essentially bystanders, or who have an insignificant involvement with a patient's care, may be unfairly "tagged with an undivided share of liability for a malpractice settlement simply because an insurance company is unwilling to engage in procedures to provide a fair adjudication of that physician's proportionate liability." The Society cautions that disallowing a remedy to physicians in situations similar to Kaufman's will cause practitioners to be hesitant about working as hospital employees unless they are given separate malpractice insurance policies, or the right to prevent cases from being settled without their consent.
The Society alleges that public reporting of such settlements will likely have an adverse effect upon public perception of practitioners' competence and, consequently, an adverse effect upon physicians' careers. The Society advocates that:
An insurance carrier should not have the power unilaterally to impose such a result upon a physician. Before a settlement involving multiple covered physicians is consummated, there must be a fair means to determine how the liability for such a settlement should be apportioned.
We understand the realities pointed out by the Society. However, the remedy is not a legal, but a practical one. One course of action available to Kaufman and other similarly-situated physicians is to negotiate *869 insurance policies in the future that provide for a consent to settle clause. Then, upon being sued for malpractice, a physician in Kaufman's situation may decline coverage under the Hospital's policy and proceed under their own policy. In this way, no settlement can be effectuated without the physician's consent and thus, the physician has control over the reporting of the settlement to the NPDB and the New Jersey database.
We are mindful that this solution carries a significant economic price tag. Kaufman will go from paying no premium for coverage under the Hospital's policy to paying a high premium for a personal policy with settlement veto power. However, that is the price for the sort of control Kaufman wishes to exercise.
Another course of action available to Kaufman is to negotiate with her employer to include her as a named insured in the policy. Thus, she will obtain the concomitant right to veto any proposed settlement. The provision of malpractice insurance coverage is a term and condition of Kaufman's employment with the Hospital. Like all employment terms, this one can be negotiated.
Our awareness of the marketplace reality of malpractice insurance costs cannot lead us to fashion a remedy that would enable a non-party to an insurance contract to fundamentally alter its terms. We are mindful that Kaufman is a third party beneficiary of the Hospital-Lexington insurance contract, and accordingly, she is entitled the benefit of the contract. Bor. of Brooklawn v. Brooklawn Hous. Corp., 124 N.J.L. 73, 77, 11 A.2d 83 (E & A 1940); Hojnowski ex rel. Hojnowski v. Vans Skate Park, 375 N.J.Super. 568, 576, 868 A.2d 1087 (App.Div.2005). However, Kaufman's benefit by virtue of her third party beneficiary status is coverage, not control over settlement.
We conclude that there is no theory of law, statutory or common law, which compels the remedies Kaufman seeks, i.e., control over settlement or an apportionment process. Thus, we affirm.
Affirmed.
NOTES
[1] These relevant provisions of the policy provide:

Settlement ... [Lexington] shall not settle or compromise any claim or suit without the approval of the Named Insured and in accordance with instructions transmitted by the Named Insured to [Lexington] or its authorized Claims Management Organization...
ENDORSEMENT # 3 SETTLEMENT OF CLAIM OR SUIT
[Lexington] will not settle any claim or suit without making a reasonable attempt to consult with the Insured ...
[2] Webb v. Witt, M-3221-03 (App.Div. March 12, 2004). Subsequently, we stayed the trial court's order, M-6505-03 (App.Div. August 18, 2004).
[3] Webb v. Witt, M-3343-03 (App.Div. March 12, 2004).